Henry C. **ALFORD**, Appellant,

v.

**STATE OF NORTH CAROLINA,**
Appellee.

No. 11598.

United States Court of Appeals
Fourth Circuit.

Argued June 18, 1968.

Decided Nov. 26, 1968.

Probable Jurisdiction Noted
April 7, 1969.

See 89 S.Ct. 1306.

Before HAYNSWORTH, Chief Judge, and BRYAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Petitioner seeks review of the summary denial of his petition for a writ of habeas corpus. Because we conclude that, under the guiding principles of United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968),[1] enunciated subsequent to the judgment of the district court, petitioner's plea of guilty to the crime of second degree murder was demonstrably coerced, the judgment appealed from will be reversed and the district court directed to issue the writ, staying its effect for a reasonable period to enable North Carolina to retry petitioner if it be so advised.

Petitioner was indicted by a grand jury of the State of North Carolina for murder in the first degree. With the approval of the state, he pleaded guilty to murder in the second degree and was sentenced on December 10, 1963, to a term of thirty years.

In due course, he sought and was granted a post-conviction hearing, pursuant to N.C.Gen.Stat. §§ 15–217—15–222 (1965). The state judge who conducted the hearing rejected petitioner's various constitutional contentions, including the claim that his guilty plea had been involuntarily induced. After the unsuccessful pursuit of various state remedies, petitioner sought a writ of habeas corpus from the district court. On September 3, 1965, the district judge denied the relief sought, expressly adopting

Doris R. Bray, Greensboro, N. C., Court-assigned counsel (Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellant.

Jacob L. Safron, Staff Atty., Raleigh, N. C. (T. W. Bruton, Atty. Gen. of North Carolina, on brief), for appellee.

1. See also, Pope v. United States, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968) (per curiam), which applied the principle of *Jackson* to the death penalty provisions of the Federal Bank Robbery Act, 18 U.S.C. § 2113(e) (1964). We note that the Court in *Pope* invalidated the capital punishment provision with no discussion of any peculiarities in the legislative history of the Bank Robbery Act such as those which occupied the Court in *Jackson* in relation to the Federal Kidnaping Act. Indeed, the legislative history of the Bank Robbery Act shows that as *originally enacted* imprisonment and capital punishment were alternative punishments, and that these alternatives were unaccompanied by a severability clause. 48 Stat. 783. Thus, *Pope* has precedential value in determining how statutes should be brought into conformity with *Jackson*, as a matter of statutory construction.

the facts concerning the voluntariness of petitioner's plea as previously found by the state judge in the post-conviction proceedings. After the time for appeal to this Court had expired, petitioner filed with the district court a purported notice of appeal, which was treated by the district court as a motion for a certificate of probable cause and a motion for a new hearing. Both motions were denied, and we dismissed petitioner's appeal on the ground that it had not been perfected within the prescribed thirty-day time limit. Alford v. North Carolina, No. 10,-391 (4 Cir. August 25, 1966) (Mem.).

Concurrently, a petition for a writ of habeas corpus was filed in this Court and was denied by Chief Judge Haynsworth, who also rejected petitioner's various constitutional contentions.[2] Again, in 1967, petitioner sought a writ of habeas corpus from the district court and, again, relief was denied.

In acting upon the 1967 petition, the district judge apparently considered that inquiry into the voluntariness of petitioner's guilty plea was foreclosed by the prior consideration of this question by the district court and by Chief Judge Haynsworth. The district judge, therefore, dealt primarily with, and rejected, petitioner's contention that he had been deprived of the effective assistance of counsel.[3]

## I

The State of North Carolina argues that petitioner has not presented either to this Court or to the district court any new factual allegations which should disturb the prior and unanimous findings of fact concerning the voluntariness of the plea of guilt. The rule of the federal courts, expressed in 28 U.S.C. § 2244 (1967 Supp.),[4] is not to entertain successive and repetitive habeas corpus petitions if the grounds asserted to support the petition have been previously decided on the merits, and the ends of justice would not be advanced by plenary consideration of the subsequent application. See, Sanders v. United States, 373 U.S. 1, 11, 15–19, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). We do not depart from this doctrine. However, the instant appeal deals primarily not with new factual allegations but, rather, with what is admittedly a new question of law, namely, the applicability and effect of the Supreme Court's recent decision in the *Jackson* case. To the extent that the appeal raises this question of law, what was said in *Sanders* is significant:

"Even if the same ground was rejected on the merits on a prior application, it

2. It should be noted, however, that the record before Chief Judge Haynsworth apparently did not contain a transcript of petitioner's trial. See, Alford v. North Carolina, Misc. No. 220 (4 Cir. August 3, 1966) (Mem.) As we shall see, the trial transcript casts significant light upon the question of the voluntariness of petitioner's plea. Additionally, Chief Judge Haynsworth's disposition of the petition preceded the decision in United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

3. In view of our disposition of this appeal, we need consider neither this contention nor petitioner's other constitutional challenges urged upon the district court, which were an alleged unlawful search of petitioner's home and an alleged denial of the right to counsel at an interrogation. We deal only with the question of voluntariness of petitioner's guilty plea.

4. 28 U.S.C. (1967 Supp.) :

"§ 2244. Finality of determination
\*    \*    \*    \*    \*
(b) When after an evidentiary hearing on the merits or a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such a person need not be entertained by a court of the United States or a justice or judge of the United States *unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ,* and unless the court, justice, or judge is satisfied that the applicant

is open to the applicant to show that the ends of justice would be served by permitting the redetermination of the ground * * * If purely legal questions are involved, the applicant may be entitled to a new hearing *upon showing an intervening change in the law* or some other justification for having failed to raise a crucial point or argument in the prior application. * * * the foregoing enumeration is not intended to be exhaustive; the test is 'the ends of justice' and it cannot be too finely particularized." 373 U.S., at 16–17, 83 S.Ct., at 1078. (emphasis added.) [5]

To the extent that proper disposition of the instant appeal depends upon factual considerations, this is the first time that the transcript of petitioner's original trial and of his state post-conviction proceedings have both been before the full court. Res judicata has no place in habeas corpus proceedings. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Sanders v. United States, supra. Especially is this so when there is reason to reappraise the facts because of the introduction of a new pertinent rule of law. Thus, we conclude that we are not precluded from a reconsideration of petitioner's constitutional argument based upon the *Jackson* case, or his factual argument based upon a consideration of the entire record of the proceedings, alone, or in the light of *Jackson*.

## II

There can be little question but that petitioner tendered his plea of guilty at a time that he was the subject of impermissible burdens condemned in the *Jackson* case. *Jackson* held invalid the death penalty provision of the Federal Kidnaping Act,[6] on the basis that it had a chilling effect upon the Sixth Amendment right to a jury trial, and the Fifth Amendment right "not to plead guilty," i. e., the privilege against self-incrimination. Of course, *Jackson* was a case which arose under the Fifth and Sixth Amendments as such, while the instant case, a state prosecution, concerns the Fourteenth Amendment; but the test of what violates the Fourteenth Amendment in this area is the same.[7]

The federal statute in *Jackson* essentially created the special offense of "kidnaping where the victim has not been liberated unharmed" punishable by imprisonment for a term of years or for life or by death, upon the discretionary, yet binding, recommendation of the jury. Where a victim has not been liberated unharmed, only an accused *who exercised his right to a jury determination of guilt or innocence* faced the prospect of the possible imposition of the death penalty.

has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ." (emphasis added.)

5. While *Sanders* spoke of proceedings under 28 U.S.C. § 2255, the present federal substitute for habeas corpus, the considerations it discussed are no less applicable to·habeas corpus by a prisoner incarcerated under state process.

6. 18 U.S.C. (1964 Ed.)
"§ 1201. Transportation
(a) Whosoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall be punished (1) *by death if the kidnaped person has not been liberated*

*unharmed, and if the verdict of the jury shall so recommend*, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed." (emphasis added.)

7. The Sixth Amendment right of trial by jury is made applicable to the states by the Fourteenth Amendment. Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). The Fourteenth Amendment outlaws coerced guilty pleas in state prosecutions. See, e. g., Com. of Pa. ex rel. Herman v. Claudy, 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126 (1956). A coerced guilty plea is, of course, an infringement upon the right not to plead guilty, i. e., the privilege against self-incrimination.

This prospect was sufficient, in the view of the Court, to render the death penalty provision unconstitutional on the two separate grounds: (1) the fact that the jury alone could impose the death penalty tended to deter the exercise of the right to a jury trial guaranteed by the Sixth Amendment, and (2) the statutory scheme tended to encourage pleas of guilty or, stated otherwise, to discourage assertion of the Fifth Amendment right not to plead guilty.

North Carolina law presently prescribes the death penalty for murder in the first degree,[8] as well as certain other crimes.[9] In each instance the penalty prescribed is death; in each instance also the jury may, in its discretion, obligatorily recommend that punishment be imprisonment for life. North Carolina does not permit an accused who pleads not guilty to waive a jury trial.[10] The accused may avoid a jury trial only if he pleads guilty and, by statute, a plea of guilty may not result in a punishment more severe than life imprisonment.[11] Thus, a person accused of a capital crime in North Carolina is faced with the awesome dilemma of risking the death penalty in order to assert his rights to a jury trial and not to plead guilty, or, alternatively, of pleading guilty to avoid the possibility of capital punishment. It was precisely this sort of inhibitory or chilling effect upon the exercise of constitutional rights which the Supreme Court condemned in *Jackson*, because a statutory scheme such as that employed by North Carolina "needlessly encourages" guilty pleas and jury waivers.[12]

North Carolina seeks to distinguish the instant case from *Jackson* on the ground that under the Federal Kidnaping Act the jury possessed the authority to *increase* the punishment to be imposed upon the defendant beyond that which

---

8. N.C.Gen.Stat. § 14–17 (1953):
    "Murder in the first and second degree defined; punishment.—A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and *shall be punished with death: Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison*, and the court shall so instruct the jury. All other kinds of murder shall be deemed murder in the second degree, and shall be punished with imprisonment of not less than two nor more than thirty years in the State's prison." (emphasis added.)

9. N.C.Gen.Stat. § 14–21 (1953) (forcible rape of female of age twelve years or more or carnal knowledge of female under twelve); N.C.Gen.Stat. § 14–52 (1953) (burglary in the first degree); N.C.Gen.Stat. § 14–58 (1953) (arson).

10. "No person shall be convicted of any crime but by the unanimous verdict of a jury of good and lawful persons in open court * * *" N.C.Const., Art. I, § 13. This right cannot be waived. State v. Muse, 219 N.C. 226, 13 S.E.2d 229 (1941); State v. Hill, 209 N.C. 53, 182 S.E. 716 (1935).

11. An accused who pleads guilty to one of the four capital crimes is to be sentenced to life imprisonment. N.C.Gen. Stat. § 15–162.1(a), (b) (1965). In the instant case, petitioner was allowed to plead guilty to murder in the second degree with the concurrence of the state and the trial court. The maximum penalty for this offense, to which appellant was sentenced, is thirty years. N.C. Gen.Stat. § 14–17 (1953).

12. Indeed, it is arguable that the North Carolina statutory scheme is more objectionable than the former Federal Kidnaping Act. Under the federal statute, the accused had three choices: he could plead guilty, not guilty and accept a jury trial, or not guilty and, with the consent of the prosecutor and the court, waive a jury trial. Thus, an accused could simultaneously avoid the death penalty and assert his innocence in a guilt-determining proceeding, namely, a bench trial. The accused in North Carolina has no such option; *if he asserts his innocence at all*, he risks capital punishment. Therefore, unlike the federal scheme, *every* defendant in a North Carolina capital case is, in the phraseology of *Jackson*, "needlessly *encourage*[d]" to forego his rights to a jury trial and not to plead guilty.

the court could impose; while under North Carolina law the statutorily-prescribed penalty for murder in the first degree and certain other crimes is death and the jury is merely given the power to *mitigate* the harshness of the maximum penalty. We are not persuaded that the difference amounts to a distinction. Under both statutes it is the jury which determines guilt, and that jury alone which, in its discretion, decides if the death penalty is to be exacted. As to imposition or non-imposition of the death penalty the jury's determination is exclusive, conclusive and final. Of greater significance, in *Jackson* the argument was advanced that the Federal Kidnaping Act's penalty provisions operated to "mitigate the severity of punishment" and that it was, therefore, immaterial that the Act "may have the incidental effect of inducing defendants not to contest in full measure" their culpability. The Court explicitly rejected this contention, stating that the consequent chilling effect upon the exercise of constitutional rights was "unnecessary and therefore excessive." 390 U.S. 570, at 582, 88 S.Ct. 1209. *Jackson* thus renders unavailing North Carolina's argument.

Nor do we find persuasive North Carolina's further argument that in *Jackson* the Court did not question the constitutionality of the death penalty *per se.* Undoubtedly this is true, but the Court in *Jackson* was careful to state that whatever the power to impose a death penalty "Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right." 390 U.S. 570, at 583, 88 S.Ct. 1209, at 1217. The clear import of *Jackson* is that if North Carolina wishes to retain the death penalty it must do so by means different from those presently enacted. That there are other means is self-evident. See, e. g., United States v. Jackson, 390 U.S., at 582–583; 88 S.Ct. 1209.

■ We are thus constrained to disagree with the dictum of the Supreme Court of North Carolina in State v. Peele, 274 N.C. 106, 161 S.E.2d 568 (1968), that there are "certain material differences" between the Federal Kidnaping Act and the North Carolina statutes,[13] so that "Jackson is not authority for holding the death penalty in North Carolina may not be imposed under any circumstances." (161 S.E.2d, at 572). To the contrary, we conclude that in the present posture of the North Carolina statutes the various provisions for the imposition of the death penalty are unconstitutional, and hence capital punishment may *not*, under *Jackson*, be imposed under any circumstances.[14]

Since the argument in this case, the Supreme Court of New Jersey has decided State v. Forcella, 52 N.J. 263, 245 A.2d 181 (1968). Because of the similarity between the North Carolina and New Jersey statutes, the case is of significance to us. Under New Jersey law an individual accused of murder has essentially two choices: (1) he may assert his innocence by demanding a trial by

---

13. But see, Laboy v. State of New Jersey, 266 F.Supp. 581 (D.N.J.1967), which reached an opposite conclusion with respect to the New Jersey statutes which in turn are like the North Carolina statutes.

14. As Chief Judge Haynsworth notes in dissent, South Carolina has sought to avoid the *Jackson* problem by holding in State v. Harper, S.C., 162 S.E.2d 712 (1968), that the South Carolina statute, which makes a plea of guilty to murder in the first degree, when accepted, the equivalent of a verdict of guilty with a recommendation of mercy (§ 17–553.4, 1967 Supp. to 1962 Code of Laws), is invalid and by requiring the submission of the issue of punishment to the jury in every case. We express no view whether the laws of South Carolina, as so construed, comport with *Jackson*. We note in passing that the purported solution to the *Jackson* problem arrived at by the South Carolina court runs directly counter to the current national trend which has produced a marked curtailment in the employment of the death penalty device. However, it is enough for the purposes of this case that North Carolina has not amended its statutes, nor has its Supreme Court undertaken to limit them in the light of *Jackson*.

jury, in which case, if convicted, he may be sentenced to death, or (2) he may enter a plea non vult, or nolo contendere, which, if accepted carries a maximum penalty of life imprisonment. In *Forcella* this statutory scheme was assailed under *Jackson*.

By a split decision the New Jersey Court held the *Jackson* rationale not controlling. This result was influenced by several considerations, but the real basis of decision was, we believe, an erroneous reading of *Jackson*. The majority pointed out that under New Jersey law only a jury could determine guilt or innocence if that issue were contested. Coupled with this fact, the majority read *Jackson* to render the Sixth Amendment right applicable only when there are two alternative guilt-determining processes and the jury trial alternative produces greater risks for the accused, and, further, to hold that both the Fifth and Sixth Amendment rights must be violated before the statutory scheme would become vulnerable to constitutional attack.

We do not find this reading persuasive. Under a strict *Jackson*—type statute, such as the Federal Kidnaping Act, an accused who pleads not guilty and seeks a bench trial waives *only* his right to a jury trial. An accused who pleads guilty (or non vult) in either the *Jackson* or *Forcella* situations simultaneously foregoes *both* his right to a jury trial and his right not to plead guilty.

*Jackson* arose in the context of a challenge to the indictment before the defendant entered any plea. Since Jackson had thus given no indication that he might ultimately wish to waive his right to a jury trial or his right to assert his innocence, the Court had before it the effect of the federal act on both of Jackson's rights. We think it incorrect to say that they were "intertwined" so

that the majority in *Jackson* did not "say that a statute which did no more than limit the penalty upon acceptance of a guilty plea must violate the Fifth Amendment." State v. Forcella, 245 A. 2d 185–186.

Like the dissenters in *Forcella*, we read *Jackson* to treat the Fifth and Sixth Amendments to be independent constitutional underpinnings for the result. It follows, therefore, that the New Jersey statutory scheme, like that of North Carolina, is more conspicuously invalid than the federal statute in *Jackson*, because under the federal statute an accused could assert his innocence and avoid a death sentence by a bench trial, while in New Jersey avoidance of a death sentence may be accomplished only by waiver of the right to plead not guilty *and* by waiver of the right to a jury trial. *Jackson* condemned the needless encouragement of guilty pleas and waiver of jury trials. Greater encouragement is inevitable in a New Jersey-type statute than in the federal statutes held invalid, in part, in *Jackson* and *Pope*. Thus, we decline to follow *Forcella*.

*Jackson* arose by a motion to quash an indictment grounded on the Federal Kidnaping Act. The case at bar arises, *inter alia*, from an attack upon the voluntariness of a plea of guilty. While *Jackson* clearly stands for the proposition that the death penalty provisions of North Carolina constitute an invalid burden upon the right to a jury trial and the right not to plead guilty, it falls short of holding that the North Carolina statutory provisions for the imposition of capital punishment are in themselves inherently coercive.[15] In *Jackson* the Court stated that the mere fact that an accused had pleaded guilty to a charge under the Federal Kidnaping Act did not necessarily render his plea involun-

---

15. " * * * the evil in the * * * statute is not that it necessarily *coerces* guilty pleas and jury waivers but simply that it needlessly *encourages* them. A procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of

a constitutional right." 390 U.S., at 583, 88 S.Ct., at 1217 (emphasis in original.) See also, Gilmore v. California, 364 F.2d 916, 918 (9 Cir. 1966) ; Laboy v. New Jersey, 266 F.Supp. 581, 584–585 (D.N.J. 1967).

tary and require reversal of his conviction.[16]

■ By a parity of reasoning, we think that a defendant who has pleaded guilty when charged with a capital offense in North Carolina is not necessarily entitled to post-conviction relief as a matter of law. *Jackson* by defining what are the impermissible burdens of a statutory scheme like that of North Carolina must be read, however, to hold that a prisoner is entitled to relief if he can demonstrate that his plea was a product of those burdens—specifically, that his principal motivation to plead guilty or to forego a trial by jury was to avoid the death penalty. *Jackson* thus defined a new factor to be given weight in deter-

mining the voluntariness of a plea—a factor present in full measure in the instant case because of the North Carolina statutory scheme.[17] As we read *Jackson,* we must determine the extent to which, if at all, petitioner was moved to plead guilty because of the incentive which the North Carolina statutory scheme supplied to achieve that result.[18]

### III

■ In the light of the principles we distill from *Jackson,* we have no hesitancy in concluding from our examination of the record that petitioner's plea of guilty was made involuntarily, and that petitioner is entitled to relief by habeas corpus.[19]

16. See, 390 U.S., at 583 & n. 25, 88 S.Ct. 1209. The Court also referred to its opinion in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which held that a defendant's failure to testify could not be commented upon by the prosecution or the trial court. The Court noted that it "obviously does not follow that every defendant who ever testified at a pre-*Griffin* trial in a State where the prosecution could have commented upon his failure to do so is entitled to automatic release upon the theory that his testimony must be regarded as compelled." Id., at 583, n. 25, 88 S.Ct., at 1217.

17. It is immaterial in our view that petitioner pleaded guilty to murder in the second degree rather than to murder in the first degree under which he was charged. For all that appears in the record, the state had not surrendered its right to prosecute petitioner for first degree murder until the time when he agreed to plead guilty to second degree murder. Of course, if the state had determined that it would only prosecute for second degree murder, *and this fact had been known to the petitioner before his plea was entered,* then it could hardly be maintained that his guilty plea was a product of a fear of the death penalty. To us the *Jackson* defect in the North Carolina statutes potentially infects the validity of the acceptance of a plea of guilty to any lesser included offense. This is not to say, however, that where, as here, the plea is accepted to a lesser included offense, there is not a higher burden of proof upon one attacking the

judgment entered thereon to show that the plea was the result of an invidious consideration than if the plea were to the degree of the crime which would support capital punishment. The very process of downgrading the charge may well suggest that the plea was motivated by factors other than a fear of death; certainly, it is circumstantial evidence that punishment by death was not a substantial possibility in view of the prosecutor's acquiescence in significant concessions. From a strictly evidentiary standpoint, we think this case is not the ordinary one and petitioner has met the burden of proof placed on him.

18. To the extent that Gilmore v. California, 364 F.2d 916 (9 Cir. 1966), cited to us by North Carolina, may be read as holding that a statutorily supplied incentive to plead guilty so as to avoid the death penalty may not as a matter of law render the plea involuntary, we think that its holding has been undermined by *Jackson.*

19. The dissent argues that we perform a futile act in granting post-conviction relief because, if it is assumed that North Carolina corrects the *Jackson* defect in its statutory scheme, petitioner "if he is well advised" will merely plead guilty once again to second degree murder. Of course, North Carolina may, at some future time, enact a capital punishment statute which is not constitutionally infirm under *Jackson.* However, we do not agree with the implied premise of the dissenting opinion that petitioner originally pleaded guilty because of the

The record is uncontradicted that from the time that petitioner entered his plea he professed his innocence of any homicide. No court has ever found that he pleaded guilty other than to avoid possible imposition of the death penalty.[20] During the course of his first appearance before the court, petitioner stated:

" * * * I pleaded guilty on second degree murder because they said there is too much evidence, but I ain't shot no man, but I take the fault for the other man. We never had an argument in our life and *I just pleaded guilty because they said if I didn't they would gas me for it,* and that is all." (emphasis added.)

Later, when questioned by his attorney concerning whether he still desired to plead guilty, petitioner reiterated his innocence, and gave voice to his fear of what the jury might do:

"Well, I'm still pleading that you all got me to plead guilty. I plead the other way, circumstantial evidence; that the jury will prosecute me on—on the second. You told me to plead guilty, right. I don't—I'm not guilty but I plead guilty."

The trial judge inquired whether petitioner still wished to plead guilty, and the question evoked the following response:

"Yes, sir, I plead guilty on—from the circumstances that he told me."

The plain meaning of petitioner's statements at the time that he entered his plea was fully corroborated by the testimony of his trial counsel when the latter was called as a witness at the state post-conviction hearing. The attorney, Mr. Crumpler, described what had transpired as follows:

"The understanding that I had when the trial proceeded—the Judge—Judge Johnston either asked him or I asked Judge Johnston to ask him to make sure that his plea was clear to him, and it's my memory—to the best of my memory he stated that he didn't do what he was charged of but he was going to plead guilty, or plead guilty to second degree *because he didn't want to run the risk of losing his life.* I don't pretend that that is verbatim, but that is to the best of my recollection." (emphasis added.)

The petitioner also testified in the state post-conviction proceeding, and his testimony then was perfectly consistent with what he had said at the time that he entered his plea:

"Mr. Crumpler said *if I didn't enter a plea I would surely get a death sentence.* That is what he told me. And my sister and a policeman, Joe McFadden, my first cousin, he was there, too. And I can't read or write, and he just run over it because he knew I couldn't understand it and *he said if I didn't take a plea of second degree I would surely get a death sentence.* And my sister said I'd better take it,[21]

evidence informally arrayed against him, rather than because of the threat of an unconstitutionally imposed death penalty. As the text will show, petitioner, immediately after hearing the prosecutor's claim of what it would prove, responded, "I ain't shot no man."

20. In denying petitioner's application for a writ of habeas corpus to this Court, Chief Judge Haynsworth so characterized the state post-conviction judge's findings: " * * * there is a conflict in the testimony over why Alford actually pleaded guilty but the *state court found* that he did so because his attorney wisely advised him to plead guilty to second degree murder and *escape the possibility of capital punishment.* * * * *The state judge*

*found* that Alford decided to plead guilty because he had no defense to the State's case against him for first degree murder and *because the guilty plea allowed him to escape the possibility of the death sentence. There is ample evidence to support this finding of fact."* Alford v. North Carolina, No. 220 (4 Cir. August 3, 1966) (Mem.). (emphasis added.)

21. Alford's sister, Mrs. Christine Green, related her version of this encounter in an affidavit filed in the Superior Court of Forsyth County, North Carolina, dated June 19, 1965. It reads in pertinent part as follows:

"Mr. Crumpler then advised Henry that the Solicitor had intimated that he would

and he told Judge Johnston that I told him to give me thirty years, said I don't know how to try this case. Then, nobody didn't say that I done that crime, nobody in court said I did the crime." (emphasis added.)

We think that there is no question but that the incentive supplied to petitioner to plead guilty by the North Carolina statutory scheme was the primary motivating force to effect tender of the plea, especially since throughout the proceedings petitioner has protested his innocence.[22] Further evidentiary hearings are unnecessary. Under *Jackson* therefore, the judgment entered on the plea cannot stand.

Reversed and remanded.

HAYNSWORTH, Chief Judge (dissenting):

I disagree, for I think a critical difference lies in the fact that Alford did not enter a plea of guilty to the charge of murder in the first degree. His plea of guilty was to the lesser offense of murder in the second degree, the maximum statutory punishment for which is imprisonment for not more than thirty years. In the historical context of North Carolina's statutes, this is a distinction of importance.

In United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, the Supreme Court held unconstitutional a statutory scheme under which capital punishment could be imposed only by a jury after a trial upon a plea of not guilty. The risk of death, which would be encountered only if the defendant pled not guilty and demanded a jury trial was held to be an impermissible burden upon the exercise of the Fifth Amendment right not to incriminate oneself and the Sixth Amendment right to a jury trial. The Supreme Court concluded that the capital punishment amendment of the "Lindbergh Act" was thus unconstitutional, but the remainder of the statute, as enacted earlier, was left intact. Dismissal of the indictment, therefore, was vacated and the case remanded, so that the prisoner would be required to exercise his choices as to his plea and to a jury trial in a context in which the risk of death would not burden one set of choices.

Here the defendant clearly stated when he tendered his plea that he was substantially motivated by the fear of execution if he entered a plea of not guilty. His contemporaneous claim of innocence may be suspect,[1] but the circumstances

---

recommend that the Court accept a plea of guilty to second degree murder and Mr. Crumpler explained that the maximum punishment for second degree murder was thirty years and that in his, Mr. Crumpler's opinion, the Court would probably sentence Henry for thirty years due to the nature of the case. Henry at first stated that he wanted to plead guilty to second degree murder; then a few minutes later, he changed his mind. I explained to Henry that if he got thirty years, I could still visit him and *it would be better than running a risk of losing his life.* Henry, at this time, was undecided and Mr. Crumpler left the cell and left us with Henry. A few minutes later, he returned and advised Henry that whatever decision he made would have to be his own decision and that no one could make the decision for him. Mr. Crumpler also advised that he could make either decision, but that we would have to reach some decision because the case was about to be called for trial. *Henry then*

*said that he didn't kill the deceased person, but that he did not want to be killed either, and at this time stated that he wanted to enter a plea of guilty to second degree murder."* (emphasis added.)

22. Whether petitioner is in reality guilty or innocent has not been judicially determined. In any event, petitioner has never conceded his guilt. That fact alone should have precluded plea bargaining under the rule announced in Bailey v. MacDougall, 392 F.2d 155, 158 n. 7 (4 Cir. 1968), "Plea bargaining that induces an innocent person to plead guilty cannot be sanctioned. Negotiations must be limited to the quantum of punishment for an *admittedly* guilty defendant." (emphasis supplied.) This case is thus an inappropriate vehicle in which to discuss plea bargaining.

1. Before the guilty plea was accepted, there was an informal statement of the State's evidence, including declarations by the defendant a few moments before

fully support his conscious purpose to avoid the risk of capital punishment. Under the circumstances, had the plea been to first degree murder, I would agree with the majority that the conviction should be set aside, for the victim of the very pressures *Jackson* sought to avoid ought not to be left to suffer their consequences.

The plea of guilty to murder in the second degree, however, was not the product of the constitutional infirmity in the statute. Had the infirmity not been present, the risk of capital punishment on a conviction of murder in the first degree would have constituted precisely the same pressure for a plea of guilty to a lesser included offense. Had North Carolina's statute provided that upon a conviction of murder in the first degree, whether after a trial on a plea of not guilty or after acceptance of a plea of guilty, the judge in his discretion could impose the death sentence, or imprisonment for life or for a term of years, there would have been no constitutional defect in the statute. Yet, in those circumstances, the pressure upon Alford to enter a plea to murder in the second degree would not have differed in the slightest from the pressure he actually experienced.

Alford will be subject to retrial, of course. North Carolina may remove the infirmity from its statute, so that when Alford is rearraigned, he will be in the same position he was in initially.[2] If he is well advised, he will again tender a plea of murder in the second degree. He will have gained nothing, and needless time and money will have been expended because of an infirmity in the statute which bears no causal relationship to the entry of the plea which the majority strikes.

Whenever a defendant bargains for a plea to a lesser, included offense, he is substantially motivated by fear of exposure to the greater punishment authorized upon conviction of the crime as charged. If the maximum punishment for the greater offense is death, there are emotional overtones which are not present if the maximum punishment is imprisonment for life or for a term of years, but the presence of a risk of capital punishment creates no conceptual distinction in a determination of the validity of bargaining for a plea to a lesser, included offense. The death penalty is no longer imposed with frequency, and a defendant may have a greater fear of the risk of a more likely sentence of life imprisonment than of the risk of less likely capital punishment. A difference in the prospect of imprisonment of one year rather than ten, of five years rather than twenty, of twenty years rather than life can weigh momentously with a defendant.

Such plea-bargaining, when the defendant is properly represented is both useful and desirable in the administration of justice. It greatly conserves judicial time and energy, leaving the courts available for the trial of cases in which there is no basis for accommodation between the parties. It is a very humane avenue of protection for a person charged with crime who recognizes his exposure to the risk of heavy punishment.

There is nothing in *Jackson* which intimates disapproval of that kind of plea-bargaining. Its absence, or the absence of agreement, is the thing that produced the *Jackson* dilemma. Yet, that is all that happened here. Alford successfully bargained for a plea to a lesser, included offense, which made him immune to life imprisonment as well as to capital punishment. He would have done the same thing had the capital punishment provision of the statute not been constitutionally defective. He may be expected to do

---

the homicide of his purpose to kill the victim and admissions, shortly thereafter, that he had done it. If the State's case at a trial was as strong as the statement indicated, the defendant would have little hope of acquittal.

2. I do not here consider the impact which Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, and Patton v. North Carolina, 4 Cir., 381 F.2d 636, might have upon retrial. See n. 5 infra.

the same thing again at his retrial. In *Jackson* the statutory defect created the issue, here it has no causal connection with it.

There is the fact that everyone involved in the negotiation of Alford's plea reasonably believed that North Carolina's statute validly authorized a jury to impose capital punishment upon a verdict of guilty of first degree murder, while limiting the court to the imposition of a sentence of life imprisonment upon a plea of guilty to that offense. Their misconception, revealed by *Jackson,* is relevant here, only if the effect of *Jackson* is an invalidation of the death penalty in North Carolina. We have no present basis for a conclusion that it is, as a comparative analysis of the Federal Kidnapping Act and North Carolina's murder statutes will demonstrate.

The Supreme Court in *Jackson* carefully considered the history of the Lindbergh Kidnapping Act. As originally enacted it permitted no more than life imprisonment. Later, however, it was amended to permit a jury, in its discretion, to impose capital punishment if the victim was not released unharmed. It was the amendment which created the difficulty and the pressure to forego a defendant's Fifth and Sixth Amendment rights. It was the amendment which the Court struck, for it reasonably concluded that Congress would prefer that the statute be left in its original form than for the nation to be left with no federal kidnapping statute.

The history of North Carolina's murder statutes contrasts starkly with that of the Lindbergh Act. Until 1949 the only penalty for first degree murder in North Carolina was death. Neither judge nor jury had any discretion about it, though juries have ways of avoiding the harsh strictures of such laws, and many a defendant whom the jury believed guilty of first degree murder must have been found guilty of a lesser, included offense. In 1949, however, N.C. Gen.Stat. § 14-17 was amended to permit the jury in its discretion to attach to its verdict of guilty a recommendation of mercy. Such a recommendation required the court to impose a sentence of life imprisonment. Four years later, in 1953, § 15-162.1(b) was enacted making a plea of guilty, when accepted by the court, the equivalent of a verdict of guilty with a recommendation of mercy and prescribing the imposition of a life sentence.

The amendments to the North Carolina statutes, like the amendment of the Lindbergh Act, introduced the *Jackson* infirmity. Though the North Carolina amendments were amelioriating, because they introduced the infirmity into the statutory scheme, they may be rationally said to be unconstitutional, just as the amendment in *Jackson,* leaving intact North Carolina's preamendment statute.

The Supreme Court of South Carolina recently dealt with the *Jackson* problem in State v. Harper, S.C., 162 S.E.2d 712, (1968). It concluded that *Jackson* invalidated South Carolina's statute, similar to North Carolina's § 15-162.1(b), making a plea of guilty to murder in the first degree, when accepted, the equivalent of a verdict of guilty with a recommendation of mercy. It prescribed the submission of the question of punishment to a jury in every capital case, regardless of the plea.

There is no reason to suppose that North Carolina's Supreme Court will not come to a similar resolution of the *Jackson* problem. It has indicated no antipathy toward capital punishment.[3] The death penalty has been an integral part of the laws of North Carolina relating to murder since it first became a state, and it is not suggested that it is un-

---

3. The contrary is indicated by its holding that a prosecutor, by asking for life imprisonment only, may not limit the jury's discretion to impose capital punishment. State v. Denny, 249 N.C. 113, 105 S.E.2d 446 (1958). The jury had directed life imprisonment, but on the prisoner's appeal the Court ordered a new trial at which the jury's discretion to impose capital punishment would not be limited as it had been by prosecutor and judge.

constitutional *per se*. Since it was the 1949 and 1953 Acts which introduced the *Jackson* infirmity, it may be expected that the courts of North Carolina will invalidate them, or portions of them, rather than all or parts of her earlier integrated statute.

Whatever the courts of North Carolina or her legislature may do to meet the problem, we now have no right to lay the infirmity to North Carolina's hoary authorization of the death penalty rather than to the later statutes which injected into the scheme the *Jackson* deprivations of Fifth and Sixth Amendment rights. There is presently no basis for our assuming the demise of capital punishment in North Carolina.[4]

The fact of the misconception of North Carolina's lawyers and judges that her statutes validly authorized the imposition of the death penalty only by a jury would be relevant, therefore, only if the plea was to the capital offense. In such a case, had the defendant known at the time that his plea would not limit his exposure to capital punishment, he might well have chosen to plead not guilty. That misconception is wholly irrelevant, however, when the plea is to a noncapital offense. Knowledge at the time that the court might impose capital punishment upon a plea of guilty to the capital crime could have had no possible effect upon his choice to plead guilty to the lesser, noncapital offense.

I think, therefore, that *Jackson* requires the retrial in North Carolina only of those defendants, who, for the purpose of avoiding risk of capital punishment, entered guilty pleas to the capital offense.[5]

4. This conclusion is unaffected by Pope v. United States, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317. In *Pope* the Supreme Court, on the authority of *Jackson* and the Solicitor General's concession vacated a death sentence imposed under the Federal Bank Robbery Act, 18 U.S.C.A. 2113(e). It permits the imposition of the death penalty if the defendant in the course of the offense or subsequent flight or escape kills or kidnaps someone, but the death sentence may be imposed only if a jury directs it. The *Jackson* defect was introduced into the statute as originally enacted. There was no prior history of the statute free of the *Jackson* infirmity. In the context of our problem, therefore, *Pope* is neutral. It does not militate against invalidation of an ameliorating amendment which introduced the *Jackson* defect rather than invalidation of portions of an earlier statutory scheme which contained no *Jackson* defect. If, therefore, *Jackson* requires invalidation of North Carolina's present statutory scheme of imposing punishment for murder in the first degree, we have no present warrant for assuming that it invalidates anything other than the amendment which introduced the defect into the scheme, just as *Jackson* held.

5. *Quare* whether Patton v. North Carolina, 4 Cir., 381 F.2d 636, applies in this kind of a situation to foreclose putting the defendant, who seeks a retrial, to the choice he contends he should have had in the first instance.