**UNITED STATES of America ex rel. Roy C. BROWN, Petitioner-Appellee,**

v.

**Hon. J. Edwin LaVALLEE, Warden of Clinton Prison, Dannemora, New York, Respondent-Appellant.**

**No. 317, Docket 33127.**

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1969.

Decided April 9, 1970.

Gretchen White Oberman, The Legal Aid Society, New York City (Milton Adler and Neal Hurwitz, New York City, on the brief), for appellee.

Joel Lewittes, New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, and Samuel A. Hirshowitz, New York City, on the brief), for appellant.

Before LUMBARD, Chief Judge, and DANAHER * and ANDERSON, Circuit Judges.

LUMBARD, Chief Judge:

Under indictment for first degree murder and faced with overwhelming evidence that in March, 1962, he had stabbed to death one Robert Feinberg whom he robbed after going with him to a hotel room for a homosexual assignation, Roy C. Brown pleaded guilty to murder in the second degree and was sentenced to a term of 40 years to life. At the time he was also under indictment for attempted murder arising out of an attack on another man.[1] Brown pleaded guilty on the advice of four experienced attorneys who were assigned to defend him.

After a hearing in the district court on Brown's claim that his plea had been involuntary, Judge Tyler granted the petition for habeas corpus on a finding that under the "totality of the circumstances" Brown's plea of guilty was not voluntary, and the state took a timely appeal.[2]

We believe the district court's findings to be clearly erroneous, so far as they are findings of fact. Moreover, we disagree with the district court's conclu-

---

* Sitting by designation.

1. This indictment was dismissed when Brown pleaded guilty. See note 3 infra.

2. Of the host of related claims raised by Brown in his petition, Judge Tyler rejected all but the two we consider at length above. Among others, he refused to consider Brown's claim that the trial judge's refusal to allow him to withdraw his plea was an issue of constitutional dimensions, since this determination was clothed in broad discretion under the provisions then in effect. N.Y.Code Crim. Proc. § 337 (McKinney 1958). See generally ABA, Standards Relating to Pleas of Guilty § 2.1 (1968). We have grave doubts that such a discretionary ruling can be questioned on collateral attack. See United States ex rel. Best v. Fay, 239 F.Supp. 632 (S.D.N.Y.), aff'd, 365 F.2d 832 (2d Cir. 1966), cert. denied, 386 U.S. 998, 87 S.Ct. 1319, 18 L.Ed.2d 347 (1967). In any event Judge Tyler was clearly correct in rejecting this claim on the facts presented, and it does not require further comment.

sion that there was coercion as a matter of law because Brown faced trial by jury with the death penalty. In our view the plea was voluntary in every respect. Accordingly we reverse the order of the district court and direct that the petition be denied.

The evidence that Brown killed Feinberg was overwhelming. Brown was a male prostitute operating in the Times Square area. On a March evening in 1962, he was hired by Feinberg, a Brooklyn businessman, and they went to a midtown hotel. It appears from the record that when Brown left the hotel room Feinberg lay dead on the floor, cut to ribbons by multiple knife slashes. Feinberg's watch was later found where it had been hidden by Brown. The second indictment tells a similar story, except that the other victim, though badly injured, survived Brown's brutal attack.

Brown's lawyers strenuously urged him to accept the district attorney's offer of a plea of guilty to second degree murder on the murder indictment.[3] On the particularly shocking facts of the crime, his experienced counsel with considerable justification believed that on the state's evidence, a jury was sure to convict and, in fact, might very well decline to recommend life imprisonment, thereby automatically imposing the death penalty. Brown, however, believed that he would prevail at trial on a claim that he acted in self-defense. Consequently, from the outset he consistently refused to plead guilty and insisted on a jury trial, the only forum available under New York law for contesting guilt on a capital charge. The matter remained at this impasse for over ten months, with defense counsel unable to sway petitioner from his determination to go to trial.

In the hope that she might be able to persuade Brown to plead, the lawyers brought Brown's mother, Mrs. Parker, to New York. She arrived from Texas on Monday, January 7, 1963, and defense counsel attempted to make clear to her the gravity of her son's situation. She accepted their assessment that it was the most dangerous folly for her son to chance a jury trial and the death penalty on his plea of self-defense and then was taken to visit him. The interview took place in a prison reception room, where Mrs. Parker and her son talked for some time in relative privacy; the lawyers were present but at some distance from the two.

The confrontation was stormy and emotional. At the hearing below, Mrs. Parker recalled the conversation:

> Well, I asked him if he would plead guilty, and he said no. I said, "Well, don't you care anything about me or consider my feelings or your brothers or sisters?" And we talked all like that for a little while, and he begin to kind of look like he had a soft feeling for me. And I realized that maybe he was changing his mind.
>
> Q. Do you recall saying anything to him?
>
> Well I brought out the fact that it would be awfully hard on the family to come here and have to claim a body that had been electrocuted, for a mother to have to do something like that.

Brown recalled:

> My mother started to talk to me. She told me that she had talked to the lawyers about the case, that they had told her that I was going to the electric chair if I didn't plead guilty.

---

3. Brown's lawyers had reached a tentative agreement with the district attorney: in exchange for a plea to second degree murder to the charge arising from the Feinberg killing, the other indictment would be dropped. The trial judge had indicated that he would accept this arrangement, and this is the arrangement eventually consummated. There is no allegation that any sentencing promises were made to Brown, nor is there any claim of coercion or impropriety on the part of the prosecutor or the court which in any way may have tainted Brown's plea.

I tried to explain to my mother that I didn't believe that the jury was going to find me guilty of murder, that I wanted a jury trial, and that she didn't have anything to worry about.

However, she had already talked to the lawyers and her mind was made up on that point, that I was going to the electric chair, and she explained to me about the other members of the family, my two brothers and a sister, that were younger than I, and she said "You should at least think about them."

She kept pleading with me to plead guilty and I kept telling her that I was not going to do it. She finally became hysterical and very upset, and I said "All right, try to be calm. I'll plead guilty. You won't have nothing to worry about."

And at that point she informed the lawyers that I had changed my mind
\* \* \*

Brown then wrote out and signed a letter dictated by his lawyers, in which he expressed his intention to plead guilty. Two days later, after another visit with his mother at which the above scene was largely repeated, he appeared before the state trial judge and pleaded guilty to murder in the second degree.

Soon thereafter with his mother back in Texas, Brown decided that the plea had been a mistake. He wrote a letter to the trial judge asking to be allowed to withdraw the plea and notified his lawyers to the same effect. In line with this decision he refused to talk with the probation officer who visited him in jail after the plea to compile a presentence report; similarly, he would not see a court-appointed psychiatrist on the grounds that, as he intended to contest his guilt, it would be improper for him to talk with an officer of the court. The trial judge, however, refused to allow Brown to withdraw the plea.

■ From these facts Judge Tyler concluded that in the totality of the circumstances the plea was not voluntarily made. We do not agree.

■ Occasionally, an inquiry into the voluntariness of a plea can focus on the relatively simple question of competence,[4] but more often the determination requires, as here, a search for the considerations which were instrumental in causing the defendant to choose to plead guilty. If among the considerations is distress created by physical or mental coercion introduced by the state or the trial court, the plea is constitutionally defective. Thus, as Judge Tyler observed, we must ask not only whether the defendant knew what he was doing, but also why. See Harrison v. United States, 392 U.S. 219, 223, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

Brown's belief that he had a good defense to the charge was ranged against the well-considered advice of his lawyers and the pleading of his mother. All of his closest advisors believed that he would certainly be found guilty by a jury and that he might well be sentenced to death. The lawyers in good faith presented their experienced assessment of Brown's situation. Brown's mother forced him to consider the effects which a conviction of murder in the first degree, and perhaps execution, would have on the family.

---

4. No serious challenge is made to Brown's competence. The atmosphere surrounding Brown's deliberations, although heated and often intense, was not so fraught with emotional pressures as to deprive him of his ability to reason or his competence to decide rationally. His lawyers had argued the disadvantages of contesting guilt for ten months to no avail, and the intensity of the interviews with his mother was the only medium which could convey to him the full impact of the course that he had chosen. Brown's faculties were not worn down to the point where his decisions could no longer be taken as the product of his reason; rather, the circumstances surrounding his change of heart make clear that he knew exactly what he was doing. It is hardly to be expected that a defendant's discussions with his mother on such a question would be free of emotion.

The realities of the defendant's situation and the shattering effect of an unsuccessful defense are the very ingredients of a rational choice for one in Brown's position. In the months of the prosecutor or the trial judge, these statements might have been coercive; coming from his lawyers and his mother, they were sound advice.

■ Quite properly Judge Tyler did not consider the state's offer of a plea bargain as a coercive intrusion on Brown's deliberation. See Shelton v. United States, 246 F.2d 571 (5th Cir.), rev'd on confession of error by the Solicitor General, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958); ABA Standards Relating to Pleas of Guilty §§ 3.1(a), 6.4–6.5 (1968).

To say that Brown's will was overborne is an unrealistic assessment of his situation. If his will is defined as a predetermination to contest his guilt, certainly this was overcome: the proposition is self-evident, for almost every claim that a plea was coerced involves an initial determination not to plead guilty. Indeed, almost every guilty plea is preceded by a plea of not guilty. When, however, Brown's will is assayed at the time he had reached a reasoned assessment of all the factors militating for and against a plea, it is apparent that his decision was a free and rational choice.

Certainly, this was a difficult, even a traumatic, decision, but we are not prepared to say in the totality of the circumstances that it was not the product of a rational assessment of the situation, based on the relevant consideration advanced by those who had petitioner's welfare at heart.

For these reasons we hold that Judge Tyler's finding that in the totality of the circumstances Brown's plea was involuntary was clearly erroneous and so it must be reversed.

■ The alternative ground employed by Judge Tyler for granting the writ is equally unsatisfactory. He relied on United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), in which the Supreme Court held unconstitutional a portion of the Federal Kidnapping Act, 18 U.S.C. § 1201(a) (1964). That section provided that a defendant who contests his guilt before a jury could receive the death penalty, while the defendant who pleads guilty or elects trial by the court could receive at most life imprisonment. Although the full effect of *Jackson* is far from clear, the Court seemed concerned that in the absence of any compelling state interest underlying a scheme of differential punishment the choice offered defendant by a *Jackson* type statute needlessly encouraged him to waive his right to a jury trial, and in some instances, to forego the right to contest his guilt.

Relying heavily on the Fourth Circuit's post-Jackson decision of Alford v. North Carolina, 405 F.2d 340 (4th Cir. 1968), *prob. juris. noted,* 394 U.S. 956, 89 S.Ct. 1306, 22 L.Ed.2d 558 (1969), Judge Tyler reasoned that *Jackson* had introduced a new element to be assessed in considering the voluntariness of a plea. The court in *Alford* held that while *Jackson* did not call for a per se rule that all pleas of guilty entered by a defendant faced by such a constitutionally impermissible punishment scheme were invalid,[5] it did establish "that a prisoner is entitled to relief if he can

---

5. In *Jackson* the Supreme Court made clear that not everyone who in the past had waived a jury trial when prosecuted under the Federal Kidnapping Act would benefit from the new decision. Instead, it required a showing that the primary reason the defendant waived a jury trial was a fear of the higher penalty. In explanation, the Court pointed to its decision in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), where prosecutorial comment on a defendant's failure to testify was held impermissible. A defendant who had testified before *Griffin* could only avail himself of that decision if he could prove on collateral attack that his primary reason for deciding to take the stand was fear of prosecutorial comment.

demonstrate that his plea was a product of those burdens—specifically, that his principal motivation to plead guilty or to forego a trial by jury was to avoid the death penalty." 405 F.2d at 347. Thus, the Fourth Circuit read *Jackson* as adding a new factor to the assessment of the voluntariness of a plea, the incentive of a statutory scheme which unconstitutionally permitted the jury to impose a heavier penalty. Contra, State v. Forcella, 52 N.J. 263, 245 A.2d 181 (1968).

Applying this test, Judge Tyler found that the New York scheme was the principal impetus to Brown's plea, and the scheme being invalid, the plea must be voided.

We disagree with Judge Tyler's reasoning on two counts. First, the New York scheme in effect when Brown was put to his choice did not suffer from the infirmities condemned in *Jackson*. Murder in the first degree in New York was punishable by death unless the jury should recommend life imprisonment. N.Y. Penal Law, McKinney's Consol. Laws, c. 40, § 1045 (1944). But there was no sentencing differential, because trial had to be by the jury since the New York constitution prohibits waiver of that right on a capital charge. N.Y. Const. art. I, § 2 (McKinney 1954). This provision not only prohibits trial by the court, but also a plea of guilty to a capital charge.[6]

The New York scheme in effect in 1963 thus has none of the faults of the Federal Kidnapping Act, or of the statutes considered in *Alford* and *Forcella*.[7]

6. Upon obtaining the consent of the court and the prosecutor, however, a defendant could plead guilty to a lesser included offense, as Brown did here. N.Y.Code Crim.Proc. §§ 332, 334, 342-a (McKinney 1958).

7. The present New York scheme provides that upon a conviction for murder, a further proceeding will be held to determine the punishment if certain conditions are met:

§ 125.30 *Murder; sentence*

1. When a defendant has been convicted by a jury verdict of murder as defined in subdivision one or two of section 125.25, the court shall, as promptly as practicable, conduct a further proceeding, pursuant to section 125.35, in order to determine whether the defendant shall be sentenced to death in lieu of being sentenced to the term of imprisonment for a class A felony prescribed in section 70.00, if it is satisfied that:

(a) Either:

(i) the victim of the crime was a peace officer who was killed in the course of performing his official duties, or

(ii) at the time of the commission of the crime the defendant was confined in a state prison or was otherwise in custody upon a sentence for the term of his natural life, or upon a sentence commuted to one of natural life, or upon a sentence for an indeterminate term the minimum of which was at least fifteen years and the maximum of which was natural life, or having escaped from such confinement or custody the defendant was in immediate flight therefrom; and

(b) The defendant was more than eighteen years old at the time of the commission of the crime; and

(c) There are no substantial mitigating circumstances which render sentence of death unwarranted.

2. If the court conducts such a further proceeding with respect to a sentence, the jury verdict of murder recorded upon the minutes shall not be subject to jury reconsideration therein.

If these conditions are not met, N.Y. Penal Law § 125.30 (McKinney 1967) the maximum penalty is life imprisonment. *Id.*, §§ 125.25; 70.00(2). Guilt still can be determined only by the jury on a murder charge.

The second proceeding runs as follows:

§ 125.35 *Murder; proceeding to determine sentence; appeal*

1. Any further proceeding authorized by section 125.30 with respect to a sentence for murder shall be conducted in the manner provided in this section.

2. Such proceeding shall be conducted before the court sitting with the jury that found defendant guilty unless the court for good cause discharges that jury and impanels a new jury for that purpose.

3. In such proceeding, evidence may be presented by either party on any matter relevant to sentence including, but not limited to, the nature and circumstances of the crime, defendant's

While the other schemes provided varying maximum sentences depending on the mode of determining guilt, in New York there was only one way to fix guilt and one body to set the sentence maximum. Rather than the invidious choice of a *Jackson*-type statute (trial by the jury with death maximum, trial by the court or guilty plea with maximum life imprisonment), or *Alford* (jury can impose death, no trial by the court, guilty plea with maximum of life imprisonment), Brown faced only the choice of contesting his guilt on the indictment with a maximum of the death penalty or pleading guilty to a lesser included offense.

■ An invidious scheme under *Jackson* is one which allots sentence maximums on the basis of the mode of guilt

determination. New York, by mandating a jury trial in first degree murder cases and restricting sentence imposition to that body, completely avoided the danger. Moreover, in *Jackson,* the Court in dicta expressly approved those schemes where the choice between death and life imprisonment is left to the jury, irrespective of how guilt is determined. 390 U.S. at 582, 88 S.Ct. 1209. We fail to see any significant difference between these statutes and the situation presented here.

Brown's choice comes down to no more than a plea arrangement, a common practice widely regarded as essential to the effective administration of criminal justice. Although some language in *Jackson* has been misread as casting doubt on this practice,[8] the court did not

background and history, and any aggravating or mitigating circumstances. Any relevant evidence, not legally privileged, shall be received regardless of its admissibility under the exclusionary rules of evidence.

4. The court shall charge the jury on any matters appropriate in the circumstances, including the law relating to the maximum and possible minimum terms of imprisonment and to the possible release on parole of a person sentenced to a term of imprisonment for a class A felony.

5. The jury shall then retire to consider the penalty to be imposed. If the jury report unanimous agreement on the imposition of the penalty of death, the court shall discharge the jury and shall impose the sentence of death. If the jury report unanimous agreement on the imposition of the sentence of imprisonment, the court shall discharge the jury and shall impose such sentence. If, after the lapse of such time as the court deems reasonable, the jury report themselves unable to agree, the court shall discharge the jury and shall, in its discretion, either impanel a new jury to determine the sentence or impose the sentence of imprisonment.

6. On an appeal by the defendant where the judgment is of death, the court of appeals, if it finds substantial error only in the sentencing proceeding, may set aside the sentence of death and remand the case to the trial court, in which event the trial court shall impose the sentence of imprisonment.

N.Y.Penal Law § 125.35 (McKinney 1967). For a discussion of the constitutionality of similar provisions see *Jackson,* 390 U.S. at 592, 88 S.Ct. at 1209.

When the revised Penal Code was enacted in 1965, section 125.30 permitted a plea of guilty to murder upon the consent of the court and the district attorney, [1965] N.Y.Consol.Laws, ch. 1030, § 125.30(2), a procedure similar to the North Carolina statute considered in *Alford.* This section, however, never went into effect, as it was repealed before its effective date, September 1, 1967, and replaced by the current version of the section, *supra.* [1967] N.Y.Consol.Laws, ch. 791.

8. In discussing the operation of the Kidnapping Act, the Court observed:

Under the * * * Act, therefore, the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die.

390 U.S. at 581, 88 S.Ct. at 1216. Some have read this language to throw into question the common practice of plea bargaining. See, e. g., Note, The Supreme Court, 1967 Term, 82 Harv.L.Rev. 63, 156 (1969). But it is only by reading the passage out of context that it arguably describes the choice faced by Brown.

In the context of the Kidnapping Act, the words "the right to contest his guilt before a jury" are essential, for they in-

have plea bargaining before it, since the issue in *Jackson* was framed on a motion to dismiss the indictment.

■■ We believe that the waivers of various rights inherent in plea bargaining are proper and not unconstitutional. Plea arrangements are of great advantage to defendants as well as to the states; without them the administration of criminal justice as we know it would be impossible. And we do not think that a negotiated plea is involuntary under *Jackson* simply because defendant is faced with the possibility of the death penalty if he does not agree to plead to a lesser offense and stands trial. Any contrary view would virtually render it impossible for a defendant to make a plea arrangement in a first degree murder case in New York, as there would be no point to the state agreeing to something today which would be inherently vulnerable to later attack if the district court's view were sustained.

We also disagree with the second premise of Judge Tyler's holding. Even if the New York statute were flawed under *Jackson*, we still would not find Brown's plea tainted. The crucial distinction between the present case and *Jackson* is that here Brown pleaded guilty to a lesser offense than the one charged. As Judge Haynsworth points out in his dissent in *Alford,* the constitutional infirmity in the statute—if there be one—cannot be said to have been causally related to Brown's guilty plea and consequent waivers. Brown's choice was simply between contesting his guilt and facing the death penalty or pleading guilty to a lesser charge, and his choice would have been the same whether or not there was a sentencing differential on the offense charged. The constitutional infirmity thus has no

effect on defendant's choice between the principal charge and a lesser included offense.

We have considered the argument concerning effective assistance of counsel raised by appellee and find it without merit. From the sentencing minutes, it appears that the trial judge was fully apprised of Brown's position by Brown himself.

We have considered the other arguments advanced by appellee to support the writ being granted and find them without merit.

Reversed.

dicated that the constitutional infirmity lurked in the fact that the manner of determining guilt *on the charge* also determined the statutory maximum sentence. In New York, however, abandoning "the right to contest his guilt before a jury" is coterminous with a plea of guilty to a lesser included offense, since the New

York constitution bars trial by the court on capital charges. Thus the words "before a jury" in the phrase are surplusage in this case. If omitted, however, the *Jackson* problem is eliminated from the above passage, which then boils down to no more than a description of plea bargaining, a situation not before the Court.