**UNITED STATES of America,**

v.

**Jesse COLSON, Defendant.**

United States District Court
S. D. New York.

June 23, 1964.

---

Robert M. Morgenthau, U. S. Atty., for Southern District of New York, New York City, William J. Quinlan, Asst. U. S. Atty., of counsel, for United States of America.

S. Edmund Resciniti, Jr., Brooklyn, N. Y., for defendant.

WEINFELD, District Judge.

Petitioner, Jesse Colson, moves pursuant to 28 U.S.C., section 2255, to vacate a judgment of conviction entered upon his plea of guilty on the ground that it was not voluntarily entered, and upon the further ground that he was not afforded, as required by Rule 32(a) of the Federal Rules of Criminal Procedure, the right of allocution to present information in mitigation of punishment, a matter of substance, he contends, in view of the particular facts of his case. Various other grounds are alleged in the petition in support of the motion, but testimony upon the hearing was offered only as to these issues.

This application presents another aspect of a case wherein the Supreme Court recently reversed the judgment of conviction of one of petitioner's codefendants, Winston Massiah, entered upon a jury verdict.[1] The reversal stemmed from the cooperation of Colson, the petitioner herein, with Government agents. who, through surreptitious means, were enabled to listen in on a conversation between Colson and Massiah, during which the latter made incriminating statements. The Supreme Court struck down Massiah's conviction on the ground that he had been deprived of his constitutional right to counsel by the use against him upon the trial of his own incriminating statements which had been deliberately elicited from him by Colson while he,

---

1. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. The taking of testimony in the present proceeding commenced on April 10, 1964, but due to the unavailability of a Government witness who was ill, was not concluded until May 28, 1964.

Massiah, was under indictment and in the absence of his counsel. Reference is made to Colson's participation in that event, since it is of some significance on this motion. It has bearing upon his contention that he was in a state of fear when he entered his plea of guilty, upon his claim that the denial of an opportunity at the time of sentence to urge upon the Court his cooperation with Government officials was to his prejudice, and upon the Government's position, now minimizing his cooperative activities as of "negligible value," in explanation of its failure to advert to them at the time of sentence.

Petitioner was the sole witness in support of his application. In opposition, the Government relied principally upon the testimony of the Assistant United States Attorney who was in charge of the trial of the case (hereafter referred to as the trial assistant), his superior, who was in charge of the Narcotics Bureau of the United States Attorney's office (hereafter referred to as the chief assistant), a customs agent, who participated in the investigation that led to the indictment of petitioner and others, and Colson's own attorney.[2] With respect to a number of vital matters, the testimony of the Government witnesses was vague and at times contradictory, so much so that when one of them indicated lack of recollection of events, the Court commented: "The whole record already is pretty much strewn with contradictions and vague recollections and uncertainties." To be sure, there are some contradictions in petitioner's case, as well as the Government's, but upon the entire record and against the background of events hereafter referred to, and after

observing the demeanor of the witnesses, the Court is persuaded that the petitioner has sustained his burden of proof that the plea was entered contrary to the requirements of Rules 11 and 32(a).[3]

The determination of the ultimate question of whether the defendant, at the time he pled guilty, had the free will essential to a reasoned choice, rests upon probabilities and, of course, cannot be resolved with mathematical certainty. It involves an evaluation of psychological and other factors that may reasonably be calculated to influence the human mind. The issue of the defendant's state of mind "is to be decided by the trier of the fact, whether court or jury, just as any other fact issue—the reasonable inferences to be drawn from all the surrounding facts and circumstances."[4] Accordingly, it is necessary to consider the plea of guilty against the totality of events and circumstances which preceded its entry.[5]

In July, 1959 Colson was indicted with Massiah for violation of the Federal narcotics laws. He was held in $10,000 bail, in default of which he was committed. While confined, he was urged to cooperate with Government officials by two customs agents, who were engaged in a continuing investigation, and after several days Colson agreed, whereupon his bail was reduced and he was released upon posting the bail. Then began an almost two-year period of cooperation with the customs agents and Assistant United States Attorneys, which included informing on codefendants, procuring information from potential defendants, who later were indicted, travelling aboard vessels and informing on seamen

2. References to the trial assistant are not to the Assistant United States Attorney whose name is listed at the head of this opinion. Also, the attorney for the petitioner was not his trial attorney.

3. Rule 11 provides, in part: " * * * The court may refuse to accept a plea of guilty, and shall not accept the plea without first determining that the plea is made voluntarily with understanding of the nature of the charge. * * *"

Rule 32(a) provides, in part: " * * * Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment."

4. United States v. Tateo, 214 F.Supp. 560, 565 (S.D.N.Y.1963).

5. Cf. Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

suspected of bringing narcotics into the country, as well as the specific conduct which led to the reversal in the Massiah case.

After almost a year and a half of continued cooperation, Colson testified before a grand jury which, in March 1961, returned a multi-count indictment against him, Massiah, and ten other defendants. In addition to substantive counts naming one or more defendants, the indictment contained a conspiracy count naming all the defendants. Colson was charged in four counts, three of which carried a five-year mandatory minimum sentence under the Federal Narcotics Control Act; the fourth was a so-called tax count, under which a court is vested with discretion to suspend sentence, or to impose a minimum two-year sentence if a prison term is indicated.[6] Colson, as well as all other defendants, pleaded not guilty.

Colson's services as an informer became known to one or more of his codefendants at or about the time the grand jury returned the indictment. He and his family were threatened directly and through a series of telephone calls. They were given protection by the Government; he was guarded by surveilling agents; his children were escorted to and from school by agents; his telephone number was changed to prevent threatening incoming calls.

During the trial preparation period Colson advised the trial assistant that he feared for his life and the safety of his family if he testified in open court against his codefendants. Notwithstanding his concern, the prosecution staff pressed him to testify; in the words of the trial assistant, "we were attempting to exercise all kinds of persuasion on [Colson] to continue his cooperation * * * and be a witness." He was given assurances that continued protection would be afforded to him and the members of his family. In the effort to reassure him, he was told that if he did testify he would be in no real danger,

because threats are carried out only upon prospective witnesses and not upon those who have already given their testimony. But more important, the trial assistant, whose recollection on this subject differs from that of other officials, admitted that the possibility of a plea to the tax count and the Court's power thereunder to suspend sentence was discussed. The pretrial efforts to induce petitioner to testify extended over a period of several weeks, up to June 13, 1961, when the trial was to commence before a visiting judge. During this period of persuasion, his lawyer was not present at any of the numerous conferences. It should be added, however, that previously, when Colson admittedly was cooperating, his meetings with members of the prosecution staff and other Government agents were with his and his counsel's consent.

When the case was called for trial on the morning of June 13th, the defendant's case was severed from that of his codefendants on the Government's motion. The trial then commenced against the other defendants and the entire morning was taken with jury selection and opening statements. Colson, at the hearing on this motion, testified that he had informed the trial assistant he would not testify because of his continued apprehension. The trial assistant acknowledged there was "no doubt [Colson] was scared stiff," but because he wavered and vacillated as to whether or not he would testify, decided to call Colson to the witness stand at the afternoon session. He refused to be sworn, stating he would not testify because his family had been threatened, whereupon the Court instructed him to raise his hand and take the oath, which he did. Defense counsel moved for a mistrial, which was denied. Colson then testified as to his occupation and sailings on board vessels. When questioned as to a meeting with Massiah, he answered, "Gee, I can't go on with this. My kids, and my wife and my life are at stake." The Court directed him to answer, but he responded, "I can't go

6. 26 U.S.C. § 7237(a) (1958).

on like this. Could I take the Fifth Amendment?" He asked to talk to his lawyer, who was not present, having left the courtroom that morning after the motion for severance had been granted.[7] The Court suggested that Government counsel communicate with Colson's lawyer, and Colson was excused and apologized to the Court, again stating he was "afraid." Another witness was called who, at a given point, also refused to answer a specific question. The Court then adjourned the trial until the following morning, June 14th. All defendants were remanded on the basis of Colson's statement before the jury that he had been threatened. A second motion for a mistrial was denied.

The reaction to this turn of events by the Assistant United States Attorneys and the customs agents, understandably enough, was not exactly one of friendliness or kindly disposition to Colson; the atmosphere was charged with excitement and turmoil.⁴ As variously described, they were angry, incensed, mad, disgusted and frustrated. But this did not deter them from renewed and persistent efforts to induce Colson to change his mind. During the remainder of that day, June 13th, members of the prosecution team, in the words of the trial assistant, "exercised as much persuasion to induce him to continue his cooperation as was consistent with our duty to the government." Whatever may be included in that euphemistic expression, their persuasive activity took various forms. They again sought to convince Colson that he was in no real danger if he went forward with his testimony. The main thrust of their efforts that afternoon

took another course. In the eight months prior to the trial he had been told by the trial assistant, and over an even longer period by the customs agents, that his cooperation would be brought to the Court's attention and would make a material difference upon sentence. He was now informed that despite his prior cooperation, which admittedly was "a very vital factor" and of substantial aid in the Government's investigation, the Court would be advised it was only of "negligible value"; that no recommendation for leniency would be made; and that if he adhered to his refusal to testify the sentencing judge would normally be expected to impose a longer sentence than if he cooperated completely and testified. Their position was that a "package deal" had been made, which included his testimony upon a trial, as well as before the grand jury—incidentally, a claim contrary to his lawyer's understanding of the defendant's arrangement. However, the defendant remained reluctant to testify, based upon his fear of consequences to himself and his family. Except for his appearance when the motion for severance was granted that morning, his attorney was not present at any time during the remainder of the day.

The next morning, June 14th, the Court reconsidered and granted the previous motions for a mistrial in view of possible prejudice by reason of Colson's statements before the jury and ordered an immediate retrial on the following morning. A substantial part of the balance of that day, June 14th, was devoted to further efforts to persuade Colson to testify; the arguments urged upon him

---

7. Colson's attorney testified he could not understand, once it was decided to call Colson as a witness, why he was not notified so that he could have been present at the trial. Had he been present, he could have advised Colson of his right under the Fifth Amendment not to take the witness stand. In re Neff, 206 F.2d 149 (3d Cir. 1953) (witness who testified before grand jury that returned indictment not required to testify at trial); United States v. Housing Foundation,

176 F.2d 665 (3d Cir. 1949) (codefendant not required to testify on own trial); United States v. Malone, 111 F. Supp. 37 (N.D.Cal.1953) (co-conspirator, but not codefendant, who testified before grand jury not required to testify at co-conspirators' trial. "Had [witness] been named as a defendant he would not, of course, have been available to the government as a witness." Id. at 38.) See generally, United States v. Miranti, 253 F.2d 135 (2d Cir. 1958).

the previous day were repeated, but he was unconvinced. Still another tack was taken; the trial assistant testified that Colson might have been informed that permission had been obtained to accept a plea of guilty to the tax count in return for his testimony upon the trial on the following morning. The chief assistant denies that the trial assistant had such authority, although the chief assistant admits he may have discussed the matter with him. Colson also claims he was informed that if he went to trial upon his plea of not guilty, he would get a fifteen-year sentence. Whatever the fact, even the inducement of a favorable plea to the tax count, or the prospect of a fifteen-year sentence in the event of a guilty verdict after a trial, failed to budge Colson. The plain fact is that he remained adamant in his refusal to take the witness stand because he was gripped by fear for the safety of his family and himself. That his concern was real and substantial grounds existed for his apprehension is acknowledged—indeed, the record permits no other finding. It is doubtful that Colson's attorney participated in any of the conferences that day.

The following morning, June 15th, shortly before the retrial of his codefendants was to begin, a final, last-minute, all-out drive was made to get him to change his mind. According to Colson's undisputed testimony, a customs agent called on him at his home and brought him to the courthouse. On the way the agent again sought to persuade Colson to testify. At the courthouse the agent, the trial assistant, and at times the chief assistant, in the absence of Colson's attorney, continued their efforts. The discussions were substantially in the same vein as those on the two previous days. When Colson's attorney did appear, he participated in the conferences, which, at times, were continued in Colson's absence. Colson, still expressing concern, remained firm in his refusal to take the witness stand at the retrial. Colson also testified that his lawyer advised him if he pleaded guilty he had a plan which would make it easier for petitioner. This claim, as well

as his claim that there was reference to a fifteen-year sentence, is challenged by the Government. However, the determination of this motion does not turn upon their resolution, since the fundamental question of whether the plea was voluntary and reflected the free will of the defendant rests not upon separate and isolated items, but, as already noted, upon the totality of events and all the surrounding circumstances.

The Court has read and re-read the testimony of Colson's attorney, and it is unclear what, if any, discussion was had that morning between him and his client on the subject of a plea of guilty, or when the decision to do so was reached. What is clear, however, is that during the two years the indictment was pending, and until the entry of the plea, there never had been any overt move to dispose of the charges against Colson either by way of trial or plea, and certainly no preparation for trial by the defense.

After the final effort that morning to get Colson to testify had failed, he and his lawyer went at once to the trial part where the codefendants were to be retried. The Government immediately moved to vacate the severance of Colson's case and to consolidate it with his former codefendants. Without opposition by his counsel, the motion was granted, whereupon his counsel stated to the Court that since it was his understanding the only plea offered to the defendant "is the indictment," he was ready to plead to each and every count. The defendant then pleaded guilty to the four counts in which he was named. Up to this point he was not questioned, as required by Rule 11. The assistant then made an extensive statement to the Court with respect to defendant's participation in the crime charged. A request by defense counsel for postponement of sentence was denied, and when the Court announced it was ready to impose sentence, the trial assistant asked "that the Court interrogate the defendant as to the voluntary nature of his plea at this time." The Court stated it was under the impression it had. Then an "off the record" conference was

had at the Bench and outside the hearing of the defendant. While recollections of the discussion at this sidebar conference are, at best, vague, and there is even contradiction as to who were the participants, the one item on which there appears to be no dispute is that the Judge expressed the view that the defendant was "very much afraid, that he was very much frightened and * * * [the trial assistant] stated there was no doubt about it, that he was extremely frightened."

Immediately thereafter the proceedings are again on the record, which now speaks for itself:

"THE COURT: Do you understand that you have entered a plea of guilty? Do you understand that?

"DEFENDANT COLSON: Yes.

"THE COURT: Has anybody promised you anything or threatened you in any way so that you did enter this plea of guilty on the basis of those promises or such threats?

"DEFENDANT COLSON: Judge, my wife and my children were approached in the street and threatened that if I take the witness stand that they would be killed while I am away, and there were two New York City policemen who stopped me and told me that if I get on the stand and testify, that I could be left in a place with my brains blown out, and I would be put in a place like a robber, and I would have my head shot off, and if I should happen to live out of it, who would believe me anyway, because I got a police record, and I shot somebody, and I got a narcotic record, and I am an informer.

"THE COURT: What are the names of the two New York City policemen?

"DEFENDANT COLSON: Your Honor, I wish I knew, but I don't know. My wife was approached in the street and threatened, and called on the phone, and the agents changed my phone number. They put guards around my house and my kids can't walk out of the house without a guard, and they can't go to school, and it's got me upset. I wanted to testify but I can't. I just couldn't do it. I tried, and they told me I could get all this time, and my wife and childrens' lives is at stake, and I just couldn't do anything about it. I couldn't leave my wife and kids back here exposed to something like that.

"They said it don't happen, but it does. I can just leave it in the hands of God—my guilt.

"THE COURT: My question is whether or not you are pleading guilty by reason of any promises that were made to you.

"DEFENDANT COLSON: No, sir.

"THE COURT: Are you pleading guilty because of any threats that were made to you by the government or by anybody else?

"DEFENDANT COLSON: (No response.)

"THE COURT: I understand you have been threatened, according to what you say. The question now is whether or not you are pleading guilty because of any threats. Has anybody threatened you into pleading guilty?

"DEFENDANT COLSON: No, not in that respect, Judge.

"THE COURT: So you do know what you are doing?

"DEFENDANT COLSON: Yes, sir.

"THE COURT: Is there anything further you would like to say?

"DEFENDANT COLSON: Excuse me, Judge. I was just talking to him.

"THE COURT: All right, sir.

"DEFENDANT COLSON: The one thing that did happen, the government did say they would consider recommending leniency, considering the help that I gave them in getting

the case together. That was said to me.

"THE COURT: Is that the reason why you are pleading guilty?

"DEFENDANT COLSON: No, sir. It was the threats. I can't get over this fear. I can't get over this fear.

"MR. JONES [defendant's lawyer]: That is not why you are pleading guilty, is it? You are pleading guilty because you are guilty.

"DEFENDANT COLSON: Yes.

"MR. JONES: Well, all right.

"THE COURT: Well, the sentence of the Court is that you serve eight years on count 1, eight on count 2, eight on count 7, eight on count 8, and the sentences on all counts are to run concurrently, which means that you have a maximum sentence of eight years to serve."

This Court is of the view that the above verbatim transcript, without more, reflects substantial doubt that the petitioner had that freedom of choice essential to a voluntary plea of guilty. It bristles with uncertainties that defendant was in a state of mind which would permit acceptance of a plea of guilty under concepts of due process of law. The defendant's failure at one point to answer the significant question as to whether he was pleading guilty because of the threats, his restricted answer, "No, not in that respect," his reiterated final statement, " * * * I can't get over this fear. I can't get over this fear," followed by the interposition by defendant's counsel, "You are pleading guilty because you are guilty," strongly suggest that more was unsaid than said. Indeed, the record points "unerringly to the existence of the uncertainty which was obviously just below the surface of the petitioner's statements to the judge."[8] And when events of the preceding hectic two days are also taken into account, the conclusion is compelled that the plea was not voluntary but the result of forces generated by those earlier events, including the threats, the defendant's well-justified fear of harm to himself and his family and the unremitting pressure by prosecution officials to persuade him to testify notwithstanding those fears.

The prosecution now advances the claim that when, at the time the petitioner pleaded guilty, he made repeated statements as to the threats and his fear by reason thereof, he was referring not to his then state of mind, but rather to his state of mind prior to his refusal to testify; that when he was sworn at the trial and publicly stated his refusal, then he was in no danger and any concern and fear of injury gradually abated, so that by the time of his plea on June 15th he was quite calm and relaxed—in short, that his fear had been dissipated. This subtle refinement is entirely unpersuasive; to accept it is to disregard common experience and to ignore the realities of the situation. The fine distinction urged by the Government overlooks the cumulative impact of the continuing pressure and constant harassment to which Colson had been subjected while he was without the advice of his lawyer, during much of the critical two-day period immediately after the aborted trial and before the entry of his plea of guilty. It disregards the precipitate speed at which events moved on the morning the plea was entered; it blithely passes by the effect of the vacatur of the order of severance. This last item exerted a force much beyond its surface appearance. As already noted, Colson's case had been severed two days earlier from that of his codefendants. When, on the morning of June 15th, the last-minute efforts to get him to testify upon the retrial of the codefendants had failed, Colson and his attorney were rushed into the trial part where the case against the other defendants was scheduled for immediate retrial. The very first move by the Government was to vacate the severance and to realign him as a defendant with the others. If,

8. Von Moltke v. Gillies, 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948).

as is claimed by Colson's lawyer, the decision had already been made to plead guilty, as he put it, because his client was "over a barrel," and he, the attorney, feared a substantial sentence would be imposed if defendant proceeded to trial and was convicted, then there was no occasion for the consolidation move; the plea of guilty could have been entered under the outstanding severed indictment against him. Whether deliberately intended or not, the end result of the reconsolidation was that Colson had the choice of standing trial with hostile defendants, scheduled to go forward at once (as it did) with the prospect of a substantially heavy sentence in the event of conviction, or else pleading guilty with the hope of ameliorating his sentence. Colson's attorney was unprepared for trial, as he readily acknowledged upon the hearing; indeed, he had assumed that Colson would be tried alone and was unaware that the case would be moved for trial that morning. The alternatives hardly afforded Colson any choice. The proceedings before and to the time Colson stood at the Bar to plead, with his reiteration of threats and fears, were the antithesis of that calm, dispassionate and objective atmosphere which is the hallmark of fundamental fairness.

To contend, as the Government now does, that at the time he entered his plea his fears had subsided and that he was calm and collected so that he had that capacity for a reasoned choice which is an essential prerequisite of a voluntary plea of guilty, is not only improbable and quite remote, but offends reason and challenges experience. The concatenation of events at and preceding his plea of guilty supports the finding that the defendant was confused, emotionally upset, in fear, and lacked the necessary freedom of will at the time it was entered, as well as for several days preceding its entry. Ac-

cordingly, the judgment of conviction entered upon the defendant's plea of guilty is hereby vacated.

■ Apart from the foregoing, the sentence imposed under the judgment of conviction on petitioner's plea must yield for failure to afford him an adequate opportunity to present information in mitigation of punishment.[9] The proper presentation of mitigating circumstances was a matter of substance to defendant. Upon his plea he faced a minimum sentence of five years, with a permissible maximum to twenty years on each of three counts. His cooperation over a two-year period, if properly presented, was a factor which the Court could deem relevant on the sentence. With the Government officials, in their efforts to persuade defendant to testify, taking the position that his previous efforts in aid of the investigation and gathering of evidence was of "negligible value"—a position open to serious challenge, the defendant contending that his cooperation did not extend to testimony upon the trial, it was required that a full exposure of all significant factors as to his activities be made.[10] Instead, the prosecutor emphasized defendant's illicit conduct so adversely that the trial assistant upon this hearing testified that his superior thought he had been unduly harsh on the petitioner. The trial assistant said not a word which in any respect suggested that for almost two years the petitioner had served the interests of the prosecution. Colson's attorney, whose understanding of the defendant's arrangement with the Government was that he was not to testify in open court, also failed the defendant and made no reference to his cooperative activities or any facts which might be considered in mitigation of sentence.

Against this background it was of the utmost importance that defendant direct-

9. See Hill v. United States, 368 U.S. 424, 429, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); United States v. Taylor, 303 F.2d 165, 167–68 (4th Cir. 1962). See also, Andrews v. United States, 373 U.S. 334, 337, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963).

10. It is recognized that such cooperation is a factor which may properly be considered even on a motion for the withdrawal of a previously entered plea of not guilty. Nagelberg v. United States, 377 U.S. 266, 84 S.Ct. 1252, 12 L.Ed.2d 290 (1964).

ly and clearly be advised of his right to allocution to set forth extenuating circumstances. The record fails to disclose that such an opportunity was afforded to him. Here it was a valuable right which, if properly availed of, might well have resulted in the imposition of the minimum five-year sentence, instead of the eight-year sentence. On this ground alone the sentence itself must be vacated.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.