**UNITED STATES of America ex rel. Roy C. BROWN, Petitioner,**

v.

**J. Edwin LaVALLEE, Warden of Clinton State Prison, Respondent.**

**No. 68 Civ. 3470.**

United States District Court
S. D. New York.

June 30, 1969.

Legal Aid Society of the City of New York, by Neal Hurwitz and Gretchen Oberman, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of State of New York, by Joel Lewittes, Asst. Atty. Gen., for respondent.

## OPINION

TYLER, District Judge.

For the previous history of these proceedings on a petition for habeas corpus and previous proceedings in the state and federal courts in this matter, see the memorandum of this court dated November 4, 1968. In the latter memorandum, an evidentiary hearing on petitioner's (Brown's) petition was directed. The hearing was held on March 19, 20 and 31, 1969. As a result of the evidence brought to light in the evidentiary hearing and for reasons to be hereinafter discussed, it is determined that Brown's petition must be granted.

On April 19, 1962, a grand jury in New York County returned indictment No. 1519/62 charging that Brown "wilfully, feloniously and of malice aforethought struck and killed Robert E. Feinberg with a knife". Thereafter, pursuant to the applicable provisions of the New York Code of Criminal Procedure, the Supreme Court of New York, New York County, assigned four counsel to represent Brown in this capital case. The lawyers assigned were Andrew R. Tyler (now a judge of the Civil Court of New York), Max Leichtman, Thomas J. Flattery and Joseph Guadagno, Jr. Finally, after a plea of guilty to the charge in indictment No. 1519/62 and to cover another indictment subsequently filed in which Brown was accused of attempted murder of one Zeltin, he pled guilty to a reduced offense of murder

in the second degree on January 9, 1963. On March 13, 1963, as heretofore indicated in my previous memorandum identified above, Brown was sentenced by Mr. Justice Charles Marks to a term of 40 years to life.

In essence, Brown here contends that his plea of guilt was taken under circumstances which deprived him of his rights under the Fifth, Sixth and Fourteenth Amendments to the Constitution. As discussed in the November 4, 1968 memorandum, he has exhausted his state remedies in regard to his contentions, which thus are ripe for resolution by this court.

## I

### The Plea of Guilty—Findings of Fact

The facts hereafter found are determined largely from the testimony of Brown and Max Leichtman, one of his assigned counsel. Messrs. Flattery and Guadagno of his team of counsel were not called as witnesses at the hearing. The facts are also to some extent based upon the testimony of Andrew R. Tyler and Mrs. Parker, the mother of petitioner, who were witnesses at the habeas hearing. Finally, where specifically noted, these findings to a limited degree are based upon the hearing testimony of Justice Marks and the Assistant District Attorney of New York County.

In April, 1962, when he was indicted for murder in the first degree, Brown was barely 23 years old. The product of a broken home, he was born in Texas and raised in his early years in orphanages in the State of Louisiana. At the age of 16, he left his mother's home and joined the Army. After three years in service, he was given an undesirable discharge because of various periods of ab-

sence without leave from his Army duties. Beginning in or about 1960, he then became a drifter, going to and from various cities principally in the south and in the southwest. He came to New York City in 1961, and with certain brief interruptions lived here continuously until the time of his indictment in April, 1962.

Shortly after counsel were assigned to represent him in the so-called "first indictment" for murder in the first degree, there ensued a number of conferences between Brown and his lawyers. At the first one, Brown discussed the events in the hotel room with the victim, Feinberg. In substance, Brown's story was that he used the knife in self-defense because the deceased was a strong, assertive homosexual. Brown also admitted to his counsel that he was questioned by the police but that they used no duress to get his statements and admissions from him.[1] Brown furnished the names of two individuals, one male and one female, who might be witnesses helpful in his behalf. As I understand the thrust of Leichtman's testimony, however, these witnesses were thereafter interviewed and in the opinion of assigned counsel were regarded as persons whose testimony could not help Brown.

Sometime in the spring or summer of 1962, Leichtman paid a visit to Assistant District Attorney Vincent Dermody, who was in charge of this particular prosecution, to discuss the case. Apparently, there was the usual guarded exchange of information and views in this conference. Dermody, however, did reveal certain evidence and also said that his office would seek the death penalty. As a result, Leichtman and his fellow counsel formed the opinion that the State's case against Brown was over-

---

1. At this conference, Brown apparently revealed to counsel what he had admitted to the police. According to the presentence report in evidence (State Ex. A), these admissions and other evidence available to the police put up a very strong case against Brown and, in particular, tended to negate any successful argument of self-defense. Assuming the substantial accuracy of the presentence report, and assuming further that Brown fully revealed his admissions to his counsel, it is obvious that they had an ample factual basis for their consistent advice to Brown to plead—i. e. not to rely on his insistently expressed view that he had a good chance to convince a jury of self-defense.

whelming. In particular, Leichtman was shown and impressed by some police photographs of the body of the deceased. These photographs indicated to him at least that there were many knife slashes, including most particularly a large slash across the neck, on the body of the deceased. In other words, these photographs convinced Leichtman and through him his co-counsel that the condition of the deceased's body in itself would tend to negate any claim of self-defense.

Nevertheless, I find that from the very first conference and consistently thereafter Roy Brown maintained to his lawyers that he wished to go to trial and "establish his innocence" upon the theory of self-defense. In effect, as will be seen hereinafter, Brown has never deviated from this view. As the summer and fall of 1962 wore on, Brown's attorneys consistently advised and indeed importuned him to permit them to arrange a plea to a lesser included offense. They warned Brown that Dermody had told them that the State would seek the death penalty. Despite the understandable position of counsel, Brown consistently told them that he did not wish to plead to a lesser offense because of his opinion that he could convince a jury that he killed Feinberg in self-defense.

In the meantime, in May or June, 1962, counsel had decided to attempt to have Brown's mother come to New York and discuss the case directly with her son. Mr. Tyler entered into correspondence with Mrs. Parker with this purpose in mind. Finally, Mrs. Parker obtained funds from some source not indicated on the record and traveled to New York City where she arrived on January 7, 1963. She was met at a hotel here in town by Mr. Leichtman. Leichtman then took her to the office of Mr. Tyler where there was a conference between the mother and assigned counsel. At this conference, all counsel present expressed their unanimous view that Brown should plead guilty to the lesser offense of murder in the second degree to cover both the "murder one" indictment and the subsequent indictment for attempted murder. It appears that Leichtman and perhaps other counsel offered their view that Justice Marks probably would be constrained to impose a sentence of from 20 years to life. Leichtman and other counsel, however, were careful to make it clear that there had been no commitment or promise to this effect. It was explained to Mrs. Parker that if such a sentence were imposed, there was a likelihood under New York law and practice that Brown would be able to serve his sentence in 13 or 14 years. Parenthetically, it should be noted that sometime prior to this conference, Dermody had apparently indicated to defense counsel a willingness to permit Brown to plead to the lesser included offense to cover both indictments or, at the very least, to make such a recommendation to Justice Marks.

Sometime shortly after noon on January 7, Mrs. Parker was taken by defense counsel to the Tombs at White Street where her son was incarcerated awaiting trial or disposition. She was brought into the meeting room where her son was present. Arrangements were made to have her confer first with her son in the presence of a matron while counsel withdrew out of earshot across the room.

Not surprisingly, the interview between mother and son was difficult and emotional. Mrs. Parker repeatedly told her son of the opinion of counsel that he should plead guilty to the lesser included offense. She pleaded with him to accept their advice. At first, Brown stubbornly refused to do as his mother asked, saying that he believed that he had a good defense to the charge. Finally, his mother became tearful and indeed hysterical. In words or substance, she stated that she did not wish to have to come back to New York to claim his dead body after a trial. Brown thereupon sought to comfort his mother. More important, he told her that he would agree to her request that he follow the advice of counsel and plead guilty.

Brown's mother then joined counsel in the meeting room at the Tombs. She

advised them that her son had finally indicated a willingness to plead. Counsel then conferred with Brown and arranged to have him sign a letter, which is in evidence, dated January 7, 1963. This letter, I find, was written out by Andrew Tyler and then in effect copied by Mr. Brown pursuant to the instructions of all counsel. Its contents are brief and interesting:

> "Mr. Leichtman, Mr. Flattery, Mr. Tyler.
>
> Gentlemen;
>
> After talking with my mother, Mrs. Parker, and talking with you, I am ready to plead guilty to the crime of murder two to cover all indictments against me provided the plea is taken before Judge Charles Marks.
>
> You are authorized to tell this to Mr. Vincent Dermody, the Assistant District Attorney.
>
> Very truly yours,
>
> Roy C. Brown"

Two days later on January 9, 1963 Brown and three of his four assigned counsel appeared before Justice Marks for purposes of plea. After the traditional colloquy between the court, counsel and Brown, wherein the answers on their face all would seem to support a valid plea, Brown's plea of guilty to the lesser included offense of second degree murder was accepted. It should be noted that Justice Marks was concerned with possible coercion in this case, as the following colloquy would indicate:

> "THE COURT: I ask you further, did your mother or anyone—did the defendant's mother—did you Mr. Tyler or any member of your associate counsel then or at any other occasion coerce the defendant to take the plea of guilty to the crime of murder in the second degree now being offered by him?
>
> MR. TYLER: No. Your Honor."

Earlier, Justice Marks had asked directly of the defendant the following:

> "THE COURT: I ask you further, has anyone, including this Court, your attorneys or the District Attorney or any member of his staff or the police or any member of your family, including your mother, coerced you, that is to say, pressured you into making this plea of guilty of murder in the second degree?
>
> THE DEFENDANT: No sir."

Brown in his petition and during his testimony at the evidentiary hearing states that his answers to this last question and other plea colloquy questions put by Justice Marks were factually incorrect and were the product of his lawyers' instructions.

At the conclusion of the court appearance on January 9th, Justice Marks, at the request of defense counsel, adjourned the date of sentence from February 18 to February 26, 1963.

On February 26, Brown appeared before the court, this time with only assigned attorneys Leichtman and Flattery present. As proceedings opened, Mr. Leichtman informed the court that the defendant had told his counsel that he viewed them as incompetent and thus wished to have new counsel assigned or permission to handle the matter for himself. This application was immediately denied by the trial court without any extended discussion. Thereupon Roy Brown asked permission to speak to the court directly, which permission was granted. Petitioner then said in substance that he was not guilty of the crime to which he pleaded. He told Justice Marks, truthfully in my opinion, that he had consistently informed his lawyers that he wished to go to trial, that he felt that he was not guilty and that he "wanted to have my day in court". He also explained to the court, again truthfully in my opinion, that his mother was brought to New York City and had conveyed to him her opinion that if he went to trial he would get the electric chair. Finally, he stated in substance that he had given in and decided to plead because his mother was upset and that he wanted her to go home. Understandably, Justice Marks treated these statements by

Brown as an application to withdraw his plea of guilty and promptly denied that application. As I read the record, it would appear that Justice Marks made this denial on February 26 without prejudice to any other application of this or any other kind on the day of sentence.

After some adjournment had apparently been agreed upon for sentence, Brown next appeared before the trial court on March 13, 1963. On that day all four of his assigned counsel were present in court. When the clerk under normal New York Supreme Court practice asked if there was any reason why the court could not proceed to sentence, Roy Brown stood up and informed Justice Marks that he wished to have the court reconsider the denial of his application to withdraw his plea of guilty. In this connection, he said,

> "I believe that Your Honor will find that your decision directly controverts Article 1, Paragraph 2, New York State Bill of Rights as here quoted:
>
>> 'A jury trial may be waived by the defendant in a criminal case except those in which the crime charged may be punishable by death, by written document, upon which the defendant in open court before the justice or judge having jurisdiction to try the offense'.
>
> The evident interpretation of this can only mean that a person so charged with a capital crime can in no way waive trial by jury. Therefore, I request permission to withdraw my previously made plea, and have a trial by jury."

The trial court immediately denied this application, whereupon Brown stated further to the judge that his counsel had pressured him to "cop out".

The trial court then proceeded to the matter of sentence. After a typical col-

loquy, sentence of 40 years to life was imposed.

Parenthetically, it should be observed that sometime in February, Brown had written a letter to a lawyer in New York who had been earlier assigned to represent him through arraignment only. According to Brown's testimony, in that letter he expressed dissatisfaction with his assigned counsel and the fact that they and his mother had coerced him to plead guilty. In effect, then, he sought the help of this lawyer. No reply was received to this letter. At or about the same time in February, Brown also wrote a letter to Justice Marks to substantially the same effect and to which he received no reply.[2]

## II

### The Plea of Guilt—Conclusions of Law

■ At the outset, certain of the issues raised by petitioner can be dealt with summarily. Thus, the question of whether Brown was deprived of the effective assistance of counsel by the actions of his attorneys in the proceedings in the state courts, or in any other fashion, was conclusively answered at the hearing in the negative. Indeed, counsel for petitioner effectively conceded this during the hearing before this court. From the facts set out above, petitioner's assigned counsel in the state trial court reasonably concluded after a study of the surrounding circumstances that Brown's best interests would be served by having him plead guilty to a reduced charge. Consequently, they set out to convince him to do so, and entered his guilty plea with the good faith view that they had obtained his voluntary acquiescence to this procedure. When Brown subsequently made it clear that he had not voluntarily pled guilty and did not concur in their judgment, they correctly sought in his behalf withdrawal of his guilty plea and, based on his in-

---

2. In February, 1963, Brown also advised a probation officer and a court psychiatrist that it had not been his desire to plead guilty and that he wished to withdraw his plea.

dication of displeasure at their handling of his case, prompt withdrawal of themselves as counsel.

 Similarly, viewed as the exercise of discretion permitted by then applicable New York law,[3] the refusal of the trial judge to grant Brown's motion to withdraw the plea of guilty did not constitute an error of constitutional proportions, if indeed an error of any kind. As noted in the memorandum of November 14 ordering the hearing on the instant petition, "the grant or denial of a motion to withdraw a guilty plea is a matter left to the sound discretion of the trial judge."[4] It is by no means clear that an alleged abuse of such discretion is reviewable by a federal court sitting in a collateral proceeding. The standard presently applied by New York trial judges is accurately set out in United States ex rel. Williams v. Deegan, 279 F.Supp. 53, 57 (S.D.N.Y. 1967), a standard which also existed in 1963:

> "In deciding whether to allow withdrawal of a prior plea of guilty, the trial judge was guided by [Section] 337 N.Y. Code Cr. Proc., which states: 'The court may in its discretion, at any time before judgment upon a plea of guilty, permit it to be withdrawn, and a plea of not guilty substituted.' New York courts have held that ordinarily a question of whether or not to set aside a plea of guilty and permit a defendant to plead not guilty is within the discretion of the court to which the motion is addressed, and a mere claim of innocence before sentence is passed and/or absence of a claim of prejudice by the State are not necessarily sufficient to require that the motion be granted. People v. Dunleavy, 26 A.D.2d 649, 272 N.Y.

S.2d 795 (2d Dept.), cert. denied, 385 U.S. 859, 87 S.Ct. 109, 17 L.Ed.2d 85 (1966); People v. Cruz, 24 A.D.2d 455, 260 N.Y.S.2d 417 (2d Dept. 1965)."

The present attitude of the federal courts seems appropriately reflected in Judge Weinfeld's passing comment that "* * * the discretionary determination [whether to allow withdrawal of a plea] is not subject to Federal habeas corpus review. * * *" United States ex rel. Best v. Fay, 239 F.Supp. 632, 634 (S.D.N.Y. 1965), aff'd 365 F.2d 832 (2d Cir. 1966), cert. denied, 386 U.S. 998, 87 S.Ct. 1319, 18 L.Ed.2d 347 (1967).

The question remaining, then, is whether Roy Brown entered a valid plea of guilty of murder in the second degree. In this case, the answer to this question lies in an examination of (A) the formal plea process, as well as the informal out-of-court communications and conferences heretofore summarized in this opinion; and (B) the impact on Brown of the existing New York statutory law relating to trial by jury in capital cases, as that law cast its shadow over pleas to the offense charged, or to lesser included offenses.

### A.

 Federal courts have traditionally exacted high standards of voluntariness for the acceptance of guilty pleas. The voluntariness requirement is a constitutional one, reaching even state court proceedings, and owing its existence to the nature of the guilty plea. The guilty plea is more than a mere admission or an extra-judicial confession:

> "* * * [I]t is itself a conviction. Like a verdict of a jury it is conclusive.

---

3. New York Code of Criminal Procedure, § 337 (McKinney, 1958).

4. See, also, memorandum decision and order of Port, J., Roy C. Brown v. People of the State of New York (N.D.N.Y. Oct. 4, 1966). It should be noted that it has not been urged here, and correctly so, that Judge Port's earlier consideration of certain of the issues involved on this petition

constitutes some form of bar to this court's consideration of those issues. No res judicata effect arises by virtue of a denial of an earlier habeas corpus petition. Additionally, it is clear from Judge Port's memorandum that his disposition was controlled by petitioner's failure at that time to exhaust existing state remedies under the then applicable law.

More is not required; the court has nothing to do but give judgment and sentence." Kercheval v. United States, 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927).

If induced by promises or threats which deprive it of the character of a voluntary act, it is void, Machibroda v. United States, 368 U.S. 487, 493, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962), whether made in federal or state court. United States ex rel. Ross v. McMann, and United States ex rel. Dash v. Follette, 409 F.2d 1016, *en banc* (2d Cir. Feb. 26, 1969).

 The plea of guilty has an additional dimension—it is a waiver. A defendant who enters such a plea thereby waives several rights, including his privilege against compulsory self-incrimination, his right to trial by jury and his right to confront his accusers, McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), certain of which, at least, have been held to be constitutionally guaranteed even as against the states. See, *e.g.*, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In short, the guilty plea is properly characterized as a waiver of a federally guaranteed constitutional right, and:

"The question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law. There is a presumption against the waiver of constitutional rights * * * and for a waiver to be effective it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege'." Brookhart v. Janis, 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314 (1966).

Acknowledging, then, the serious nature of the guilty plea, see, Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and the strict standards of voluntariness enforced by the federal judiciary with respect to such pleas, a corollary question arises as to how the determination of voluntariness (or involuntariness) is made by a federal court considering a collateral attack upon a state or federal conviction based upon a plea of guilt. Several cases decided in this court [5] and a recent decision by the Court of Appeals [6] set out the applicable standards in this circuit.

In United States v. Tateo, 214 F.Supp. 560 (S.D.N.Y. 1963), Judge Weinfeld concluded that determination of the voluntariness of a guilty plea rests upon an investigation of the particular factors and circumstances which bore on the defendant's frame of mind at the time of pleading:

"The issue of whether the guilty plea was in fact voluntary or the product of mental coercion cannot be determined with mathematical precision. Of necessity we deal in probabilities in deciding whether the defendant, at the time he pled guilty, had that free will essential to a reasoned choice either to continue with the trial or to enter a plea of guilty. Its determination involves an evaluation of psychological factors and elements that may be reasonably calculated to influence the human mind. And while probing the human mind is beyond the ken of the average layman and indeed that of the average judge, the issue of the state of a man's mind is to be decided by the trier of the fact, whether court or jury, just as any other fact issue—the rea-

5. United States ex rel. Elksnis v. Gilligan, 256 F.Supp. 244 (S.D.N.Y. 1966); United States v. Colson, 230 F.Supp. 953 (S.D.N.Y. 1964); and United States v. Tateo, 214 F.Supp. 560 (S.D.N.Y.1963).

6. United States ex rel. Ross v. McMann, and United States ex rel. Dash v. Follette, *supra.*

sonable inferences to be drawn from all the surrounding facts and circumstances." At 565.

This rationale was reiterated by Judge Weinfeld in United States v. Colson, *supra*, the court noting that there the proceedings up to and at the time Colson stood at the bar to plead " * * * were the antithesis of that calm, dispassionate and objective atmosphere which is the hallmark of fundamental fairness." 230 F.Supp. at 961. Such a record, concluded the court, compelled the conclusion that the plea was not voluntary, but " * * * the result of forces generated by those earlier events, including the threats, the defendant's well justified fear of harm to himself and his family and the unremitting pressure by prosecution officials to persuade him to testify notwithstanding those fears." [7]

I construe the recent decisions of the Court of Appeals for this circuit, United States ex rel. Ross v. McMann and United States ex rel. Dash v. Follette, 409 F.2d 1016 (2d Cir. 1969) *en banc*, as substantially endoring the approach set out by Judge Weinfeld in this area.[8]

■■■ From these precedents, I draw several conclusions concerning the factors which must govern decision on the voluntariness of Roy Brown's guilty plea. It is clear, first, that a plea of guilty, even when the defendant is represented by counsel, is not an absolute bar to collateral attack upon the conviction. Second, such a plea, to be sustained, must have been the considered choice of the accused, free of coercion,

promises, or any other factor or inducement which unfairly influenced or overcame the will of the accused. Third, voluntariness is determined by examination of the totality of the circumstances surrounding the plea. The question is not entirely whether the petitioner made a knowing decision to plead, but, as well apparently, the reasons "why". See Harrison v. United States, 392 U.S. 219, 223, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); Ross v. McMann, *supra*, 409 F.2d at 1019.

■■■ I conclude that the "why" in this case is to be found in the pressures brought to bear upon Roy Brown by the events and circumstances leading up to and existing at the time of his plea of guilty. On the basis of the factual background recounted at the outset of this memorandum and the relevant case law in this circuit, I am constrained to hold that Roy Brown's plea was involuntary because it did not reflect his own considered choice. Rather, it was the product of a will overborne by the persistent and unrelenting advices of counsel, the hysterical pleadings of an overwrought mother, and the awesome impact of the possibility of death at the hands of a blue ribbon panel of jurors not his peers.[9]

This conclusion is required by several factors. As noted, petitioner's counsel were convinced that he must renounce his right to trial by jury and proceed by way of plea of guilty. That there was good reason[10] for this unanimous view of all assigned counsel cannot be decisive, particularly where, as here, the record shows that Brown early and consistently

7. It should be noted that the decision in *Colson* was not based on claims by defendant that the prosecution engaged in specific acts of coercion or inducement, but rather, "upon the totality of events and all the surrounding circumstances." 230 F.Supp. at 958.

8. Although the specific issue in *Ross* and *Dash* concerned the waiver of all prior non-jurisdictional defects occasioned by a subsequent voluntary plea of guilty, the Court of Appeals took the opportunity to discuss standards to be applied in deter-

mining the "voluntariness" of a plea of guilty.

9. At the hearing on this petition, there was testimony that Brown had been informed by his attorneys that he would be tried by a "blue ribbon" panel of businessmen who would be prejudiced against Brown, an indigent, since the deceased was also a businessman. The record shows that at the time of the state court proceedings, the District Attorney had moved to empanel a "blue ribbon" jury.

10. See fn. 1, *supra*.

rejected the advice of counsel and sought a jury trial. Brown's sincere views, whatever one may think of their wisdom, were plainly overcome by the persistent admonition of counsel, the plea of his mother and the threat of death in the event he availed to himself his right of trial by jury. Indeed, this analysis is necessarily buttressed by the added fact that immediately after leaving court on the day of pleading guilty, Brown communicated to his mother, a probation officer, the judge and his original lawyer his still strong desire to have his guilt or innocence decided by a jury. After his arraignment, Brown only once ostensibly admitted guilt to anyone. That once, of course, was on January 9, 1963, the day of his change of plea, the second of four occasions on which he appeared before the trial judge. On that occasion, Brown spoke, not his own words, but the words of his counsel designed to achieve the end counsel, not Brown, had determined to be desirable. Aside from Brown's hearing testimony that his admission of culpability to Justice Marks was not true, I believe that the record as a whole points to this last factual conclusion. Thus, in substantial part, the " * * * question therefore narrows down to whether counsel has power to enter a plea which is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him." The Supreme Court has said that the answer is in the negative. See Brookhart v. Janis, 384 U.S. 1, 7, 86 S.Ct. 1245, 1248, 16 L.Ed.2d 314 (1966).

## B.

Another analysis of the facts of this case points to a conclusion that petitioner's plea was invalid under federal law.

In 1963, when Roy Brown pled guilty, the New York constitutional and statutory sentencing structure for murder in the first degree had the effect of requiring a plea to a lesser charge of homicide in order to avoid risk of the death penalty. Article 94 of the Penal Law of New York then provided that:

> "Murder in the first degree is punishable by death, unless the jury recommends life imprisonment as provided by section ten hundred and forty-five-a. L. 1937, c. 67, § 1 eff. March 17, 1937." New York Penal Law § 1045 (McKinney, 1944).

Article 94 further provided:

> "A jury finding a person guilty of murder in the first degree, as defined by subdivision two of section ten hundred forty-four, may, as a part of its verdict, recommend that the defendant be imprisoned for the term of his natural life. Upon such recommendation, the court may sentence the defendant to imprisonment for the term of his natural life. Added L. 1937, c. 67, § 2, eff. March 17, 1937." N.Y. Penal Law, § 1045-a (McKinney, 1944).

These provisions mesh with a provision of the New York Constitution, Article 1, Section 2 of which provided, in 1963 as today, in pertinent part:

> "A jury trial may be waived by the defendant in all criminal cases, except those in which the crime charged may be punishable by death * * *." N.Y. Const. Art. 1, § 2 (McKinney, § 1954).

Under this statutory scheme, a defendant such as Brown charged with first degree murder, though entitled to a jury trial, had no right to waive a jury and proceed to trial before a judge—and no right to waive trial of any kind and plead guilty. See e. g., People v. La Barbera, 274 N.Y. 339, 8 N.E.2d 884 (1937). He could, however, plead guilty to a lesser offense than that charged.[11] See, e. g., People v. Ortiz, 50 Misc.2d 451, 270 N.Y.S.2d 445 (1966); People v. Van Orden, 174 Misc. 65, 19 N.Y.S.2d 938 (1940); Dodd v. Martin, 248 N.Y. 394,

---

11. Sections 332, 334, and 342-a of the New York Code of Criminal Procedure (McKinney, 1958).

162 N.E. 293 (1928). If a defendant sought jury trial by pleading not guilty to the first degree murder charge, the jury was authorized to impose the death penalty. Conversely, if the defendant successfully elected to plead guilty to a lesser included offense, he escaped the possibility of the ultimate sanction. In effect, then, a defendant's choice of his right to trial by jury, with its attendant rights of confrontation of witnesses and avoidance of self-incrimination, hinged upon his willingness to chance death.

■■■ In United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the Supreme Court held unconstitutional a statutory scheme which burdened the exercise of constitutional rights with the threat of death:

> "Under the * * * Act, therefore, the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die * * *. The inevitable effect of any such provision, is of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial." At 581.

I read *Jackson* to require that where such burdens are attached to the exercise of constitutional rights, a waiver of those rights must be closely examined to see if it has been extracted from the accused by operation of the statutory scheme.[12] The Court of Appeals for the Fourth Circuit has recently reached this same conclusion in Alford v. State of North Carolina, 405 F.2d 340 (4th Cir. 1968), a case similar to this one on its facts. In *Alford*, a defendant faced with a first degree murder charge had elected to plead guilty to the lesser offense of second degree murder. The effect of the North Carolina statute was, as here and in *Jackson*, to reserve to the jury alone the power to impose the death penalty. The *Alford* court felt that its case was controlled by *Jackson*. That court did not conclude that a *per se* rule of invalidity applied to Alford's plea simply because he had been faced with a theoretically impermissible choice at the time of pleading. Rather, Judge Winter, writing for the majority, interpreted *Jackson*, by defining the impermissible burdens of statutory schemes like those of New York and North Carolina, "to hold that a prisoner is entitled to relief if he can demonstrate that his plea was a product of those burdens—specifically, that his principal motivation to plead guilty or to forego a trial by jury was to avoid the death penalty." *Alford, supra,* at p. 347. As viewed by Judge Winter, *Jackson* defined a new factor to be given weight in determining the voluntariness of a plea —"the extent to which, if at all, petitioner was moved to plead guilty because of the incentive which the * * * statutory scheme supplied to achieve that result." *Id.*

■■■ Following the rationale of *Jackson* and *Alford*, I conclude that the New York statutory scheme was the principal impetus for Brown's plea. Put simply, but for the applicable New York law and procedure, Brown would have been free to obtain his steadfastly sought right of a jury to determine his guilt or innocence. There can be no doubt from the record that the threat of the death penalty in the event of a jury trial permeated the thoughts and actions of Brown, his mother and his lawyers. Clearly, the latter were motivated at every step by their concern for their client's life. The hysterical behavior of Brown's mother was rooted in her conviction, fed by the statements of Brown's counsel, that she would have to "bring her son home in a

---

12. See, also, the decision of a three-judge panel of this court antedating *Jackson* and pertaining to certain procedures of the Federal Juvenile Delinquency Act, 18 U.S.C. § 5033, in Nieves v. United States, 280 F.Supp. 994 (S.D.N.Y.1968).

box." Brown himself was subjected to the unending stream of statements from both these sources that if he continued to insist on a trial before a jury, he had no reasonable hope of emerging with his life.

Thus, at a time of stress, Brown could only conclude that he had two options: (1) he could continue to assert his innocence and thus assume the risk of death at the hands of the jury; or (2) he could take advantage of the bargaining between his counsel and Assistant District Attorney Dermody and plead guilty to the lesser offense of second degree murder, waiving all rights, but assuring his continued survival. That Brown was precisely aware of this dilemma is illustrated by his remarks to Justice Marks on March 13, 1963 (page 1250, *supra*). Consequently, I conclude that the New York statutory scheme placed a constitutionally impermissible burden upon Brown in his attempt to exercise his right to a jury trial. For this added reason, his plea to the lesser included offense on January 9, 1963 must be set aside.

A stay of the order of this court granting the petition and setting aside Brown's plea of guilt is hereby granted for a period of forty days from the date of filing this opinion to enable the State to decide upon and perfect an appeal if so advised. Moreover, on my own motion, I grant a certificate of probable cause. 28 U.S.C. § 2253. Aside from the fact that the Supreme Court has noted probable jurisdiction in *Alford*, 394 U.S. 956, 89 S.Ct. 1306, 22 L.Ed.2d 558 (1969), it can be reasoned that the overall test of voluntariness recently approved by the Court of Appeals for this circuit in *Dash* and *Ross* is necessarily so "mathematically imprecise" as to suggest the desirability of appellate review in this case where, as heretofore discussed, I have found that Brown's assigned counsel and the trial judge proceeded as they did with substantial reason and the best of motives.

It is so ordered.